**Ray KING, Appellee,**

v.

**The CITY OF GUYMON, Oklahoma, a municipal corporation, Appellant.**

**No. 46291.**

Court of Appeals of Oklahoma,
Division No. 2.

March 12, 1974.

Rehearing Denied April 9, 1974.

Ogden, Ogden & Board, Guymon, for appellee.

Bryan L. Wright, Dale, Belanger & Wright, Guymon, for appellant.

BRIGHTMIRE, Presiding Judge.

Early on the morning of November 3, 1968, plaintiff, Ray King, got out of bed intending to take a bath. In the bathroom he bent over, struck a match, then . . . a blinding blast . . . a scream. When the natural gas explosion victim came to, he says, "I couldn't see. By feeling I could tell I was laying in the bathtub with feet hanging over the edge."

On April 29, 1970, the 61-year-old carpenter submitted a claim for personal injury damages totaling $39,422.44 (including $2,722.44 for medical expenses) to the city of his residence, Guymon, Oklahoma—owner and operator of a municipal natural gas distribution system—charging that the explosion resulted from the negligent allowance of gas to escape from a city gas line located in an alleyway adjoining plaintiff's property. This claim the city rejected on May 6, 1970, and this action was commenced about three weeks later culminating in a posttrial judgment based upon a jury verdict favoring plaintiff in the sum of $22,067.

In an attempt to vacate the judgment Guymon advances four propositions: (1) its pretrial motion to dismiss should have been sustained because of an earlier judgment against it obtained by plaintiff's fire insurance carrier for part of the same loss; (2) "commercial annuity rate table" was improperly admitted into evidence at trial; (3) likewise "annuity computations for loss of earnings" should not have been admitted; and (4) evidence of hospital and medical expense incident to treatment of plaintiff's eyes should have been rejected.

Defendant's first contention poses here the most serious problem and its factual background will bring it into focus. Something over a month after the explosion plaintiff and his wife executed a "Sworn Statement in Proof of Loss to the Provi-

dence Washington Insurance Company," the company with which they carried their homeowner's insurance policy, claiming property damage loss of $10,355.34 to their $19,500 home and its contents. Providence paid the claim in full December 16, 1968, "in consideration of" which plaintiff and his wife executed a form called "Subrogation Receipt."[1]

Thereafter on some date not disclosed in the record, Providence filed a claim for $10,355.34 with defendant. No notice of this was given plaintiff. What negotiations ensued are not recorded, but the parties agree the claim "was denied and rejected."

The record does show the following occurred: On January 7, 1970, Providence filed a lawsuit against defendant asking for recovery of the $10,355.34 it had to pay its insureds, Ray and Velma King, on account of the negligence of defendant in causing the loss-producing explosion. Plaintiff was not notified of this act.

On the very same day, January 7, 1970, defendant filed an answer entering its appearance and generally denying the petition's allegations. No notice of this filing was given plaintiff.

Nor was plaintiff informed of the entrance of a judgment in the case a week later against defendant for half the amount sought.[2]

In regard to whether plaintiff ever authorized his insurance company to sue for his personal injuries, he said, "I sure didn't. The only thing I remember signing was a release to my company. I had settled with them." He testified further that he knew nothing about the Providence lawsuit until his lawyer told him about it after a claim for his personal injuries damages had been filed with the municipality.

Plaintiff's petition lay dormant and the city in default for the next nine months. Finally on February 24, 1971, defendant without leave of court filed a "Motion to Dismiss" in which it said that since this

---

1. This instrument reads in part:

"RECEIVED OF THE Providence Washington Insurance Co., the sum of Ten Thousand Three Hundred Fifty Five and 34/100_ _ _ Dollars ($10,355.34) in full settlement of all claims and demands of the undersigned for loss and damage by Fire-Explosion occurring on the 3 day of Nov. A.D.1968, to the property decribed in Policy No. H–30477 issued through the Adams Insurance Agency of said Company.

"In consideration of and to the extent of said payment the undersigned hereby subrogates said Insurance Company, to all of the rights, claims and interest which the undersigned may have against any person or corporation liable for the loss mentioned above, and authorizes the said Insurance Company to sue, compromise or settle in the undersigned's name or otherwise all such claims and to execute and sign releases and acquittances and endorse checks or drafts given in settlement of such claims in the name of the undersigned, with the same force and effect as if the undersigned executed or endorsed them.

"Warranted no settlement has been made by the undersigned with any person or corporation against whom a claim may lie, and no release has been given to anyone responsible for the loss, and that no such settlement will be made nor release given by the undersigned without the written consent of the said Insur-

ance Company and the undersigned covenants and agrees to cooperate fully with said Insurance Company in the prosecution of such claims, and to procure and furnish all papers and documents necessary in such proceedings and to attend court and testify if the Insurance Company deems such to be necessary but it is understood the undersigned is to be saved harmless from costs in such proceedings."

2. The "Journal Entry of Judgment" reads:

"NOW, on this 15th day of January, 1970, this matter coming on in regular order to be heard before me, the undersigned District Judge, and the Plaintiff being present by its counsel, Frank E. Hensley, and the Defendant being present by the City Attorney of the City of Guymon, Bryan L. Wright of Dale, Belanger & Wright, and both parties announcing ready for trial and waiving a jury, the Court Proceeded to examine the pleadings herein, hear evidence thereon, and being fully advised in the premises, the Court finds that Plaintiff should have and recover judgment herein, and it is accordingly ORDERED, ADJUDGED AND DECREED that Plaintiff have and recover judgment from the Defendant in the sum of $5,177.67.

"s/Merle Lansden
District Judge"

cause of action arose from the same wrongful acts complained of in the Providence suit, defendant is being subjected "to a multiplicity of suits." And, continued defendant, it "would be prejudiced" by the maintenance of this action especially since "plaintiff in this cause of action . . . remained silent until the 14th day of April, 1970," quite some time after entrance of the Providence judgment. The pleading further contended, "that to permit a splitting of the causes of action against this defendant would result in prejudice and substantial injustice" by reason of which plaintiff's action should be dismissed. .

Overruled was this motion on March 1, 1971. Then the parties entered into a written stipulation of facts underlying the motion to dismiss in preparation for interlocutorily certifying the legal question to the Oklahoma Supreme Court. The trial court duly certified the question but the high tribunal declined to decide it.[3]

The case lingered languishing until January 24, 1972, when the defending city, again without leave of court, filed what it called a "Demurrer and Motion for Summary Judgment." The basis, of course, was that the earlier stipulation rendered indisputable that the Providence judgment adjudicated a portion of the single cause of action plaintiff once had and because the law prohibits splitting a cause of action, it followed that plaintiff cannot maintain this action. Whether this demurrer and motion for summary judgment was ever ruled on is not shown by any order in the record.

What happened next was a pretrial conference on September 29, 1972. The parties proceeded as if the case were at issue based on defendant's counsel statement, "We will file an answer." On November 10, 1972, the city finally filed one (without leave of court) containing a general denial, and an admission it owned the gas distribution line near plaintiff's house which it said it had periodically inspected in a pru-

dent manner without discovering any leaks, and blamed the blast on the contributory negligence of plaintiff in constructing his house 15 feet from defendant's gas transmission line and connecting to defendant's underground service line contrary to safe gas plumbing standards.

On November 14, 1972, after hearing the evidence, a jury of 12 returned a unanimous verdict in favor of plaintiff awarding him $22,067 against the municipality.

Guymon first argues that its motion to dismiss should have been sustained because plaintiff's entire cause of action was destroyed by reduction to judgment of the property damage part split off by subrogation to Providence. This is said to be the result reached in Lowder v. Oklahoma Farm Bureau Mutual Ins. Co., Okl., 436 P.2d 654 (1967)—a case defendant insists precedentially compels dismissal of plaintiff's action here.

The trouble is, though, defendant is not clear on either the facts or holding in that decision—a subrogation suit by an insurance company against a tortfeasor to recoup the amount paid to its policyholder for his first year's medical expense—because in its brief it says: ". . . in the Lowder case the *injured party* made recovery for property damage and the insurer on subrogation attempted to recover for medical payments made to the injured party under a separate action . . . ." (emphasis ours) Contrarily the opinion actually proceeds on the premise that the injured party had received nothing and had not yet filed suit against the tortfeasor. The defending tortfeasor's appeal brought up a question of whether the trial court had erred in allowing the subrogee insurance company to prosecute the action to judgment for only a fraction of the damages involved in the tort victim's cause of action. The high court showing concern for the promotion of justice concluded the trial judge had indeed erred and in revers-

---

3. Providence Washington Ins. Co. v. City of Guymon, Okla. Supreme Ct. Cause No. 44,859, cert. denied (April 27, 1971).

ing his judgment, directed dismissal of the insurance company's petition upon remand.

The *Lowder* rationale invokes traditional concepts of equity; it exalts fairness; and it ranks substance above form. To begin with the court recognized subrogation as a creation of equity, a legal tool designed to protect, not defeat, "the legal and equitable rights of others." Its use will not be "allowed where the rights of innocent third persons . . . having equities of equal or superior rank, will be prejudiced." Because, therefore, of the long-entrenched and valuable rule forbidding a cause of action to be split among two or more lawsuits, it is manifestly unfair to permit the subrogee of a sum recoverable under subrogor's cause of action to obtain a judgment only for such amount and thereby foreclose rights of the cause's owner to recover whatever else he may under it.

While the *Lowder* doctrine does not furnish a complete answer to the issue we are to here resolve, it certainly lends neither aid nor comfort to the position of defendant.

More relevant is the recent decision in Aetna Cas. & Surety Co. v. Associates Transports, Inc., Okl., 512 P.2d 137 (1973). There the operative facts were that Aetna paid its policyholder $553.49 for an automobile collision coverage loss caused by an Associates truck, and notified the latter it was claiming subrogation rights. Following this the tort victim sued the tortfeasor for *all* damages from the wreck. About three months later Associates settled the lawsuit with Aetna's policyholder who executed a general release and filed a motion asking the court to dismiss her action with prejudice. "The settlement was made without notice to plaintiff [Aetna], and without obtaining a release from plaintiff," emphasized the court in its opinion. Aetna thereupon sued Associates and its insurance carrier for the $553.49. In that case Associates, like the City of Guymon here, set up in its answer the earlier lawsuit—which, among other things, asked for the $553.49—its settlement, its dismissal, and

the policyholder's general release, as a complete bar to Aetna's action because of being a piece of the cause of action the further prosecution of which is precluded by "the rule against splitting a cause of action."

Here again a sense of fairness led the court to conclude that after Associates received notice of plaintiff's subrogation rights, it could not defeat them by settling with the assured alone, and the legal theorem employed to bridge the gap between this conclusion and the anti-cause-splitting rule was to imply a waiver of the rule by its beneficiary—the tortfeasor.

Of course the facts in the case at bar differ from those in both *Lowder* and *Aetna* in that the subrogee of a fractional interest in subrogor's cause of action went through the motion of obtaining a judgment against the tortfeasor which the latter seemed quite willing to have become final—indeed, the proceeding bears all the earmarks of a so-called "friendly" one.

■ ■ ■ We think the circumstances bring to the aid of the cause of action's owner the very same fundamentals of fair play woven into the earlier case law fabric. Guymon made no attempt nor manifested any desire to protect itself against an adverse adjudicatory consummation of the Providence action—an action forbidden by the *Lowder* doctrine. Being the tortfeasor the city is presumed to have known the gas explosion may have caused both property and personal injuries and that all damages were neither sought nor recoverable in Providence's petition. Yet it complained not, filed an appearance and general denial within hours after the petition was filed, and within a week suffered what surely was an agreed-upon judgment to be entered for one-half the property damage. Such behavior is characteristic of a tortfeasor's attempt to defeat a tort victim's cause of action by means of an amicably adjudicated lawsuit and is akin to the settlement of one condemned by *Aetna*. We view the difference as being without substance. The rule against splitting a cause

of action can be and is waived by failure of a defendant—the party for whose benefit the practical rule was created—to timely assert it. Stanley v. Sweet, 202 Okl. 448, 214 P.2d 906 (1950). Timeliness in this case required assertion in the Providence suit at least before judgment. And because it failed to do so Guymon implicitly waived any right to complain of a later action to enforce what remained of the cause. Or to say it another way Guymon's invocation of the rule as a defense to plaintiff King's action is untimely, hence unallowable.

Defendant's second proposition is that the court should not have admitted into evidence a "commercial annuity rate table." Not because an annuity table per se is inadmissible, but because the one used here involved commercial rates which "contained an element of profit, interest, and policy fees," thus, "did not reflect actual value of any projected loss of earnings."

First of all annuity and mortality tables are admissible as a guide to estimating monetarily the extent of earning capacity reduction as distinguished from actual loss of earnings. For loss of earning capacity is compensable though one is unable to show a specific loss of earnings. Complete Auto Transit, Inc. v. Reese, Okl., 425 P.2d 465 (1967). To establish loss of earning capacity there needs only be shown evidence of permanent disability, either total or partial. Jones v. Eppler, Okl., 266 P.2d 451 (1953). Since plaintiff adduced evidence of some permanent disability resulting from the explosion, annuity and mortality tables became admissible.

Secondly the cross-examination of plaintiff's actuary made it abundantly clear to the jury that the premium required to buy a sum certain monthly income annuity policy included cost of handling and profit of the company selling the annuity. This information they could consider along with other relevant facts in estimating the future loss. Frankly, when you get right down to it, it would be asking quite a bit of a jury to think only in terms of a pure or hypothetical annuity administered by no one. Of course in its ordinary noncommercial sense the term "annuity" refers to a yearly payment of a fixed sum of money for life or a period certain. Mathematically it can be determined how much principal is needed to provide a fixed annual payment consisting of income at a given rate of interest and a portion of principal in sufficient proportionate amounts to end up with zero principal at the expiration of some particular period of time. This formula is actuarily adapted to an individual's life expectancy—a statistical product—to achieve a lifetime annuity figure for that individual.

Defendant's argument presupposes that the jury in utilizing the annuity evidence must necessarily assume the annuitant will also be the annuitor and do his own investing possessed of all the financial knowledge required accompanied by all the risks and hazards that implies. We think, however, the law is not that fastidious and that the jury may also consider commercial annuity rates and award enough for the annuitant to purchase an annuity insurance policy. No reason appears to us why an option should not abide with the annuitant to avail himself of benefits inherent in such a policy from the standpoint of money management expertise, convenience, and a relatively greater principal safety factor. This result simply means the "element of profit, interest, and policy fees" complained of is nothing more than a foreseeable consequence of a tortiously inflicted permanent disability and therefore a compensable detriment within the purview of 23 O.S.1971, § 61.

Finally, the award was something less than a third of the amount required in order to produce the monthly income sought by appellee during the expected remaining years of his life.

These circumstances prevent us from holding that the use of a commercial annuity table was improper.

Guymon's third contention is akin to its second—that another reason the

admission of annuity computations was wrong was because the injured appellee "failed to show any loss of earnings." The answer to this complaint was mentioned earlier in discussing proposition two —namely, the question is not whether an actual loss of "earnings" has been shown, but whether proof there be of permanent disability implying loss of "earning capacity." The distinction between the two detriments is substantial. A single clarifying example will suffice. Suppose a young lady works by day as a secretary and by night is a singer possessing unrealized substantial earning potential in connection with the latter. And suppose a throat injury is tortiously inflicted sufficient to destroy the young woman's voice, but leaves unimpaired her capacity to continue work as a secretary. Is it not clear that the lady may very well have no significant loss of earnings yet have substantial loss of earning capacity?

The evidence here, as we said before, is sufficient to warrant admitting the annuity and mortality tables.

■　Guymon's last complaint is that evidence of hospital and medical expenses for plaintiff's postexplosion cataract surgery should not have been admitted because of a lack of predicatorial proof that the explosion caused the eye malady. The main thrust of the argument is that the physician who removed the opaque lens from both of plaintiff's eyes testified concerning the "cataract condition" while being cross-examined by defendant saying, "I was not impressed with the fact it resulted from an eye injury." And further he said he made no observation that the cataracts were caused by trauma.

If this were the only evidence on the subject we might dwell a while on what definite meaning may be gleaned from the ophthalmologist's carefully worded reply to equally carefully worded questions. But it is not. A neurosurgeon with rather impressive credentials examined plaintiff extensively. His findings interpreted in light of plaintiff's medical history induced him to opine that "these are post-traumatic cataracts with sufficient aggravation to his vision because of development of cataracts in the short time following the explosion." The physician further explained, "[W]e have seen a number of individuals especially from tire explosions . . . who develop cataracts in 90 days. Usually 30 to 60 days after the explosion. I think it is well recognized by most physicians and certainly should be by most ophthalmologists the post-traumatic development of cataracts following explosion is common."

Proof of causation like other elements of an actionable cause need not be undisputed. The brain surgeon's testimony of a causal connection between the explosion and the cataracts, even if contrary to that of the cataract remover, is quite sufficient to render the cataract surgery bills admissible.

We hold no reversible error appears in the record.

Affirmed.

BACON, J., concurs.