**MIDAMERICA FEDERAL SAVINGS AND LOAN ASSOCIATION, a federal savings and loan association, Plaintiff–Appellee,**

v.

**SHEARSON/AMERICAN EXPRESS INC., a Delaware corporation, and Don Crow, an individual, Defendants–Appellants.**

No. 87–1247.

United States Court of Appeals, Tenth Circuit.

Sept. 28, 1989.

dict finding that the defendants breached their fiduciary duty to MidAmerica Federal Savings and Loan Association (MidAmerica), violated section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, and violated section 408(a)(2) of the Oklahoma Securities Act, Okla.Stat.Ann. tit. 71, § 408(a)(2) (West Supp.1989). Only the section 408(a)(2) and fiduciary duty claims remain before this court.[1] On appeal, the defendants allege that the district court erred in denying their motions for directed verdict and judgment notwithstanding the verdict, in instructing the jury on various issues, in failing to order a new trial on all issues due to the erroneous instructions relating to the section 12(2) claim, and in denying compelled arbitration of the claims arising under state law. We affirm.

## I.

We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the jury's verdict. *See Kitchens v. Bryan County Nat'l Bank,* 825 F.2d 248, 251 (10th Cir.1987); *Schwager v. Sun Oil Co.,* 591 F.2d 58, 62 (10th Cir.1979).

In December 1982 MidAmerica established a new money market fund that attracted over $74 million in new deposits by January 15, 1983. Because these deposits were attracted in part by MidAmerica's offer of a "bonus" interest rate for the initial deposit term, these deposits were deemed to be "very short term" and "[interest] rate sensitive." MidAmerica therefore desired to reinvest the funds for approximately six months in a short-term investment security yielding in excess of its 10.75% to 11.25% cost of money.

MidAmerica spoke to Shearson representative Don Crow about their investment needs. MidAmerica had a longstanding relationship with Crow, having purchased securities through him since as early as 1979. At the time of the transaction giving rise to this suit, Crow handled between two-thirds

Lloyd S. Clareman (Harvey D. Myerson, of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, and Claire V. Eagan, of Hall, Estill, Hardwick, Gable, Golden & Nelson, of Tulsa, Okl., with him on the briefs), of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, New York City, for defendants-appellants.

Sam P. Daniel, Jr. (Richard P. Hix and Charles S. Plumb, of Doerner, Stuart, Saunders, Daniel & Anderson, with him on the brief), of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Oklahoma, for plaintiff-appellee.

Before MOORE, TACHA, and BALDOCK, Circuit Judges.

TACHA, Circuit Judge.

The defendants, Shearson/American Express Inc. (Shearson) and Don Crow, appeal from a judgment entered on a jury's ver-

---

**1.** The trial court ordered a new trial on the section 12(2) claim acknowledging that it had erroneously instructed the jury as to that issue.

The section 12(2) claim was later dismissed pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

and three-quarters of MidAmerica's securities investments. Crow understood MidAmerica's investment requirements, and told MidAmerica that their goals were obtainable. He advised MidAmerica to invest in GNMA Series I Unit Investment Trusts ("GNMA unit trusts"). Crow represented to MidAmerica that the GNMA unit trusts would trade like "straight" GNMA's, securities with which MidAmerica had investment experience. He further represented that the GNMA unit trusts would be more suitable for MidAmerica's needs than the straight GNMA's.

Crow's advice was not well-founded. A GNMA unit trust is essentially a packaged version of several issues of straight GNMA's. Because straight GNMA's required a minimum investment of $25,000, small investors were effectively precluded from investing. The GNMA unit trust concept was designed to allow individuals to invest relatively small amounts in GNMA securities through pooling their funds.

Despite their apparent similarity, significant differences exist between the two GNMA investment vehicles. Crow never explained these distinctions to MidAmerica. Unlike straight GNMA's, which permit volume purchasers such as MidAmerica to obtain a discount on the purchase price, the GNMA unit trust did not offer such a discount. Further, the GNMA unit trusts carried an additional three and one-half percent sales charge that was not applicable to straight GNMA's. The sales charge reduced the effective yield of GNMA unit trusts, making them particularly unsuitable for investors such as MidAmerica who required a short term investment to provide needed liquidity. Consequently, instead of fulfilling MidAmerica's financial goal of a profitable short-term investment, the GNMA unit trust practically "locked in" a loss because, even assuming MidAmerica held the investment for two years and

there was no downward movement in the security's market price, the yield would have been below MidAmerica's cost of money.[2]

In reliance upon Crow's recommendation, MidAmerica's chief securities investment advisor, Steve Allen, placed an initial order with Crow on January 12, 1983, for $10 million in GNMA unit trusts hedged by 100 futures contracts. Allen then left MidAmerica for a new position.

Allen was temporarily replaced by Ron Smith, an outside consultant who had previously advised MidAmerica with regard to management issues. Smith lacked Allen's experience with securities, and Crow was aware of this fact. Smith was hired to implement the GNMA unit trust investment strategy that had been developed for the money market funds. Consistent with this strategy, he placed three more orders for GNMA unit trusts in the amounts of $15 million, $10 million, and $15 million respectively. MidAmerica hedged two of these purchases but, acting against Crow's advice and its own original investment strategy, decided not to hedge the third.

On the trade dates for each of the four orders, Shearson mailed to MidAmerica a sale confirmation and a twenty-eight page statutory prospectus. Each prospectus contained multiple references to the one-time sales charge. The prospectuses arrived after Allen's departure from MidAmerica, and no one at MidAmerica reviewed the prospectuses until March, when Allen's permanent replacement, Larry Merryman, arrived. MidAmerica relied upon Crow's representations during the interim period and therefore remained unaware of the sales charge. Further, from January 20 until early March, Crow reported to MidAmerica inflated daily quotes of the market value of their investment because he failed to take into account the initial sales charge. This caused MidAmerica to be-

---

**2.** If the maturity date of the underlying GNMA securities extended beyond this two year period, a profit theoretically could be possible through capital appreciation caused by a decline in interest rates, if such appreciation was sufficient to offset the sales charge and the loss resulting from the differential between MidAmerica's cost of funds and the yield on the GNMA unit trust. This profit potential would not necessarily make this investment suitable for MidAmerica, however, as the same potential for capital gain from an interest rate decline would have existed in a straight GNMA security that did not require payment of the sales charge.

lieve falsely that the investment was yielding at a higher rate.

Larry Merryman became MidAmerica's new Chief Financial Officer on March 1, 1983. He began his job by reviewing the GNMA unit trust investments and immediately became concerned about their appropriateness for MidAmerica. Merryman expressed these concerns to the president of MidAmerica, Donald Ingle, and explained the ramifications of the sales charge.

After learning of the sales charge, MidAmerica proceeded to register an objection to the transactions with Crow and other Shearson representatives. MidAmerica's attorney, Gene Howard, contacted Crow on March 7 and discussed the possibility of working out a rescission of the purchases. Howard proceeded to New York and, on March 8–9, conferenced with Shearson's general counsel and other Shearson representatives regarding rescission of the purchases. Shearson ultimately rejected MidAmerica's offer of rescission. MidAmerica subsequently sold the securities in 1984 for a substantial loss.

In January 1984, MidAmerica filed suit raising nine claims based on the defendants' alleged violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Oklahoma Securities Act, and various other pendent state claims. Eight of those claims ultimately went to trial. The jury returned verdicts in July of 1985 for the defendants on five claims but was unable to reach verdicts on the section 12(2), section 408(a)(2), and the breach of fiduciary duty claims. A new trial was set for these remaining three claims.

In October 1984, prior to the second trial on the remaining three claims, Shearson moved to compel arbitration. The district court denied this motion and the claims went to trial during April and May of 1986. The jury returned verdicts for MidAmerica on all three counts. This appeal followed.

## II.

■ The defendants allege that the district court erred in denying their motions for summary judgment and directed verdict on the section 408(a)(2) claim. Because an issue of state law is presented here, we give some deference to the resident district judge's interpretation, but ultimately review de novo whether the district judge applied the proper legal standards. *See Wilson v. Al McCord Inc.*, 858 F.2d 1469, 1473 (10th Cir.1988).

## A.

As the Supreme Court has stated in the analogous context of interpreting federal securities statutes,

> the starting point in construing a statute is the language of the statute itself. Moreover, "if the langugage of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary 'to examine the additional considerations of "policy" ... that may have influenced the lawmakers in their formulation of the statute.'"

*Randall v. Loftsgaarden*, 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986) (citations omitted) (quoting *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980)) (reviewing damages provision of section 12(2) of the 1933 Act). We believe that the language of section 408(a)(2) is sufficiently clear "to invoke this 'plain language' canon," *id.*

Section 408(a)(2) of the Oklahoma Securities Act provides in relevant part:

(a) Any person who:

. . . .

(2) offers or sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the other party not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable. . . .

Okla.Stat.Ann. tit. 71, § 408(a)(2).

■ In order to prevail, MidAmerica was required to show the following: (i) that the defendants offered or sold securities by

means of an untrue statement or omission of a material fact; (ii) that such untrue statement or omission caused other of the defendants' statements to be misleading; and (iii) that MidAmerica did not know that the statement was untrue or that a material fact had been omitted. The record reflects that MidAmerica satisfied these requirements and that Crow's actions on behalf of Shearson fall within the purview of the statute.

Taking into account only Crow's oral representations, the record shows that MidAmerica satisfied the first two requirements. The GNMA unit trusts are securities under the applicable federal and state securities laws. Shearson representative Crow sold the GNMA unit trusts to MidAmerica pursuant to investment discussions between Crow and MidAmerica's chief securities investment advisor, Allen. Crow's oral representations to Allen regarding the GNMA unit trusts omitted the fact that investment in those securities would include a one-time, three and one-half percent sales charge—a fact material to the transaction. This omission regarding the sales charge made Crow's other statements to Allen, such as the statement that GNMA unit trusts traded like straight GNMA's, misleading. In fact, straight GNMA's would trade similarly to GNMA unit trusts only if the sales charges were omitted and volume discounts were permitted for purchases of the unit trusts.

The primary dispute here stems from the interpretation of the third requirement, given that Shearson disclosed to MidAmerica the sales charge for each unit trust order in the prospectuses which arrived at MidAmerica after Allen had left. Allen's interim replacement did not read the prospectuses and relied exclusively on Crow's oral representations while he handled the GNMA unit trust investments. MidAmerica did not have actual knowledge of Crow's omissions until March 1983 when MidAmerica's new permanent investment advisor, Merryman, began work. The defendants argue that because MidAmerica received a prospectus fully disclosing the sales charge after placing each order and had ten days from the receipt of each to register a complaint concerning the transaction, knowledge of the information contained in the prospectuses should be imputed to MidAmerica as a matter of law. We disagree.

The defendants' argument centers on the fact that the omission from the oral communication was later disclosed to MidAmerica in the written prospectus. The oral communications with Crow provided the inducement for the transactions, however, and in these circumstances we find Crow's omissions at the time of offer to be sufficient under the statute.

Section 408 holds liable any person "who *offers or sells* ... a security *by means of* any untrue statement of a material fact or any omission." Okla.Stat.Ann. tit. 71, § 408(a)(2) (emphasis added). Placing the words "offers or sells" in the alternative indicates that liability may be founded upon either act. Further, although the "by means of" language in the statute "requires some causal connection between the misleading representation or omission and plaintiff's purchase," *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1225 (7th Cir. 1980) (interpreting section 12(2) of the 1933 Act), the statute does not require that a sale be effected solely on the basis of the misleading representation or omission. Finally, nothing in section 408(a) restricts the scope of actionable misrepresentations or omissions to those made in writing.

Here, Crow's misleading statements induced MidAmerica to purchase the GNMA unit trusts as an effective short term investment vehicle for their money market funds. This inducement occurred before Shearson sent the prospectuses revealing the true nature of the investment. The record reflects that MidAmerica did not have actual knowledge of the sales charge prior to March 1983. The sales were therefore carried out by means of the misleading oral communications, and they occurred without any knowledge of the misleading nature of such statements.

The face of section 408(a)(2) is clear in requiring that plaintiff show only lack of knowledge of a misleading statement or omission in order to prevail. Section 408 is

designed to protect purchasers, and requires only that the purchaser "not know[ ] of the untruth or omission." Under the circumstances of this case, where the oral representations were the inducement for the sale and the correct information was not provided to MidAmerica prior to the first purchase in this transaction, we decline to impute constructive knowlege of the information contained in the prospectuses to MidAmerica.

### B.

As stated above, the issue before us concerns section 408(a)(2) of the Oklahoma Securities Act, which we find to be unambiguous on its face. That Act, however, is meant to be read in coordination with the related federal securities provision, section 12(2).[3] Section 501 of the Oklahoma Securities Act specifically provides that the Act "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this act with the related federal regulation." Okla.Stat.Ann. tit. 71, § 501 (West 1987); *see also State v. Hoephner,* 574 P.2d 1079, 1081 (Okla.Crim.App.1978). We find that section 12(2) and its case law lend further support to our conclusion that section 408(a)(2) requires only that purchasers show a lack of actual knowledge of an untruth or omission to prevail.

Shearson's claim that knowledge of the information contained in the prospectuses should be imputed to MidAmerica as a matter of law is based in part on the principle that writings are generally favored over oral communications. *See Acme Propane Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988) ("in the law of securities a written disclosure trumps an inconsistent oral statement"). In support of their position, Shearson quotes the Seventh Circuit's statement that "the securities laws are designed to induce issuers to commit their representations to writing, and judicial use of the writings as authoritative disclosure promotes certainty and thus planning," *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 530 (7th Cir.1985). The Seventh Circuit, however, was reviewing the requirements of Rule 10b–5, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). The language of section 12(2) dictates a different outcome.

Section 12(2) states that "any person" who *"offers or sells* a security ... by means of a *prospectus or oral communication,* which ... omits to state a material fact" may be liable to an unknowing purchaser. 15 U.S.C. § 77*l* (emphasis added). On its face, then, section 12(2) makes actionable misleading omissions from either oral communications or written prospectuses. If Congress intended sellers of securities to be held liable only when there is not complete disclosure in the prospectus, it could have limited the scope of the statute in that regard. "We must presume that Congress acts with deliberation, rather than by inadvertence, when it drafts a statute." *United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir.1985). The fact that there may be both oral communications and a written prospectus involved in a transaction, and that section 12(2) places them in the alternative cuts against mandating that the prospectus take precedence, particularly here where the sales were induced by means of the oral misrepresentations.

Further, the words "offers or" were added to section 12(2) in a 1954 amendment. One scholar recognized the significance of

---

**3.** The language of § 408(a)(2) is substantially similar to the language of section 12(2) of the Federal Securities Act of 1933. Section 12(2) provides in relevant part:

Any person who—

....

(2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untrust or omission,

shall be liable to the person purchasing such security from him....

15 U.S.C. § 77*l*.

this change where a buyer reads a misleading 'preliminary prospectus' and purchases securities on that basis without reading the corrected final prospectus:

> [The] incident of the split original definition of "sale" into separate definitions of "sale" and "offer," must be given some meaning.... [I]t is possible in § 12(2) to give meaning to both phrases—"offers or" and "by means of"—by grounding liability on the use of a misleading prospectus or other document that was corrected before the sale *unless it is clear that the correction was brought to the buyer's attention before he bought.*

L. Loss, *Fundamentals of Securities Regulation* 891 (1988) (emphasis in original).

This analysis is instructive in the present situation. Here the misleading omission was corrected by the prospectus. MidAmerica, however, relied only upon the oral representations and had no reason to believe the prospectuses would reveal information that would radically change the transaction.

Shearson contends that relying on the language of the statute is inadequate and that the Tenth Circuit case of *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511 (10th Cir.1983), mandates that the contents of a prospectus always be imputed to the purchaser who receives it. That case states that "the knowlege of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents." *Id.* at 1518. *Zobrist,* however, does not control this case and arose from a suit alleging violations of section 10(b) of the Securities Exchange Act of 1934 ("section 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. We decline to extend the rule in *Zobrist* to claims arising under section 12(2).

The standards for bringing a claim under section 10(b) and Rule 10b–5 differ from those governing section 12(2). Under Rule 10b–5, unlike sections 12(2) or 408(a)(2), a purchaser must show justifiable or reasonable reliance on the defendant's misrepresentations in order to prevail. *See Zobrist,* 708 F.2d at 1516. If the purchaser had no right to rely on the defendant's misrepresentations, " 'an essential linchpin of its [10b–5] claim is missing.' " *Angelos,* 762 F.2d at 525 (quoting lower court opinion). The justifiable reliance requirement has led to various circumstances where, although defendants may have made material misrepresentations or lied in the context of a securities sales, the purchasers' claims were not actionable. *Id.* at 529–31 (listing examples).

Section 12(2), on the other hand, has no requirement of justifiable reliance on the part of a purchaser. Because of this, a purchaser's investment sophistication is immaterial to a section 12(2) claim. *Sanders v. John Nuveen & Co., Inc.,* 619 F.2d 1222, 1229 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981); *Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 696 (5th Cir. 1971). A purchaser has no duty to investigate a seller's possible fraud and need not verify a statement's accuracy. Further, cases setting forth the elements of a section 12(2) claim typically state simply that the "plaintiffs must prove that they 'had no knowledge of any untruth or omission'." *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 783 (11th Cir.1988) (quoting *Hill York Corp.,* 448 F.2d at 695); *see also Junker v. Crory,* 650 F.2d 1349, 1359 (5th Cir. Unit A 1981); *Sanders,* 619 F.2d at 1229; *In re Olympia Brewing Co. Sec. Litig.,* 612 F.Supp. 1367 (N.D.Ill.1985).

The case law makes clear that plaintiffs under section 12(2) are not held to the same standard of care as are plaintiffs under section 10b–5. "Section 12(2) does not establish a graduated scale of duty depending upon the sophistication and access to information of the customer. A plaintiff under § 12(2) is not required to prove due diligence. All that is required is ignorance of the untruth or omission." *Sanders,* 619 F.2d at 1229 (citations omitted). One scholar noted that "it is a firmly entrenched principle of § 12(2) that the '[a]vailability elsewhere of truthful information cannot excuse untruths or misleading omissions' by the seller." Kaminsky, *An Analysis of Securities Litigation Under Section 12(2)*

*and How it Compares with Rule 10b–5*, 13 Hous.L.Rev. 231, 267–68 (1976) (quoting *Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir.1956)).

Taken together, section 12(2) and its case law support our conclusion that the plain meaning of both section 12(2) and section 408(a)(2) requires only that purchasers of securities show a lack of actual knowledge of a material omission in order to prevail. This will not place any undue burden on the part of sellers. Here, Crow induced the sale of the GNMA unit trusts through oral misrepresentations which he knew were being relied upon by MidAmerica. He had a duty to inform MidAmerica of the omissions prior to MidAmerica's purchases. Simply sending a prospectus at a time in which he knew MidAmerica lacked an investment advisor was not sufficient. We read the lack of knowledge requirement of section 12(2) according to the statute's plain meaning and find that MidAmerica's lack of actual knowledge of Shearson's misrepresentations is sufficient to satisfy the requirement under section 408(a)(2).

### III.

Shearson contends that they were not in a fiduciary relationship with MidAmerica as a matter of law and that the district court erroneously instructed the jury on the law governing the breach of fiduciary duty. Again, we review de novo the district court's interpretation of state law. *See Wilson v. Al McCord*, 858 F.2d at 1473.

Although the Oklahoma courts have refrained from announcing a precise definition of the term "fiduciary relationship," *see In re Continental Resources Corp. (Continental Ill. Nat'l Bank & Trust Corp. v. FDIC)*, 799 F.2d 622, 625 (10th Cir.1986); *In re Estate of Beal (Thompson v. Gammon)*, 769 P.2d 150, 155 (Okla.1989), the Oklahoma Supreme Court recently set forth standards used to determine whether a fiduciary relationship exists under Oklahoma law: [4]

[A] "fiduciary relationship" ... exists whenever trust and confidence are placed by one person in the integrity and fidelity of another.... " '[Fiduciary]'relation' is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed, in both an unfair advantage is possible."

... In each case we have looked at the facts and found a relationship which would allow a reasonably prudent person to repose confidence in the other.

*In re Estate of Beal*, 769 P.2d at 154–55 (citations omitted) (quoting *In re Null's Estate*, 302 Pa. 64, 153 A. 137 (1930)).

In another case, the Oklahoma Supreme Court stated that a fiduciary relationship extends to relationships in which

there is confidence reposed on one side and resulting domination and influence on the other. The relationship need not be legal but it may be either moral, social, domestic or merely personal.... [A] fiduciary relationship springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation.

*Lawrance v. Patton*, 710 P.2d 108, 111–12 (Okla.1985) (footnotes omitted).

Before a court will declare a relationship fiduciary it "will require a relation where there is weakness on one side and strength on the other resulting in dependence or trust justifiably reposed in the stronger." *In re Estate of Beal*, 769 P.2d at 155. Shearson was in a position of strength because its agent, Crow, held himself out to

---

**4.** *In re Estate of Beal* (*Thompson v. Gammon* ), 769 P.2d 150 (Okla.1989), involved the determination of whether a "confidential relationship" existed for purposes of a will contest. The court stated that "[a] 'confidential relationship' is generally synonymous with a 'fiduciary relationship,'" and noted that in practice and result the two are indistinguishable. *Id.* at 154–55; *see also Fipps v. Stidham*, 50 P.2d 680, 683 (Okla. 1935). We, therefore, look to the standards set forth in *In re Estate of Beal* in determining whether the district court correctly applied the law of Oklahoma on the issue of whether a fiduciary relationship existed.

MidAmerica as a securities broker-dealer with expertise in the area of this transaction and who had knowledge of MidAmerica's specific needs. Although it cannot be said that MidAmerica was completely ignorant regarding the business of buying and selling securities, at the time of these transactions MidAmerica was temporarily without the advice of an in-house financial investment advisor. MidAmerica informed Crow of this fact and Crow knew MidAmerica was relying on his advice. MidAmerica justifiably put its trust in Crow based, in part, on their long-standing business relationship and Crow's knowledge of MidAmerica's situation.

■ Crow's misleading omissions regarding the GNMA unit trust transactions further placed the parties in unequal positions. Crow knew the circumstances surrounding the GNMA unit trust purchases but failed to fully inform MidAmerica of key provisions of the sale, *e.g.,* the three and one-half percent sales charge. MidAmerica therefore went through with the sales uninformed. Crow's misrepresentations to MidAmerica coupled with MidAmerica's long-standing relationship with and reliance upon Crow, justifiably "lulled [MidAmerica] into a sense of security from which [it] did not awaken," *Fipps,* 50 P.2d at 684, until MidAmerica regained a permanent in-house investment advisor. Crow implicitly accepted MidAmerica's trust by continuing to advise MidAmerica as to the investment while aware that MidAmerica had no other advisor with whom to consult. Although the fact that MidAmerica's account with Shearson was nondiscretionary would generally cut against the finding of a fiduciary relationship, here that fact is not sufficient to defeat MidAmerica's claim. Although Shearson did not execute any orders beyond those authorized by MidAmerica, MidAmerica's authorization stemmed from its reliance upon Crow's misrepresentations. We therefore hold that sufficient evidence exists to support the jury's conclusion that a fiduciary relationship existed between Shearson and MidAmerica and that Crow, on behalf of Shearson, took unfair advantage of that relationship in breach of his fiduciary duties.

The district court instructed the jury on the law regarding breach of fiduciary duty as follows:

The third cause of action plaintiff alleges is that the Defendants, Shearson and Crow, acted as broker/dealers to MidAmerica over a long period of time, and specifically in connection with the offers to sell and sales to MidAmerica of units in the GNMA Series I Unit Investment Trust, and thus had a fiduciary relationship with MidAmerica.

. . .

. . . [Y]ou are instructed that in order to recover under its claim of fiduciary duty, MidAmerica must prove by a preponderance of the evidence that the Defendants breached a fiduciary duty owed MidAmerica in connection with MidAmerica's purchase of the GNMA Unit Trust securities.

The Court also instructs you that a fiduciary relationship exists where one party places special confidence and responsibility in the other, and the other gains some benefit. In the context of securities investments, a fiduciary duty develops between a broker and a customer when a broker holds itself out to a customer as possessing special knowledge or expertise with respect to security investment advice and recommends an investment by the customer in a particular security.

The broker receives an economic benefit from making the recommendation, and the customer makes the investment based upon the broker's advice.

Involvement by the broker and the customer in earlier investment transactions, including but not limited to acts as a consultant or providing investment advice in earlier transactions, can also support the creation of a fiduciary duty by the broker to the customer.

In *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1271 (10th Cir. 1988), this court articulated the standard to be applied when reviewing jury instructions:

[W]hen examining a challenge to jury instructions, we review the record as a whole to determine whether the instructions "state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable." *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984). We thus "consider all that the jury heard and, from standpoint of the jury, decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.'" *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir. 1984) (quoting *Alloy Int'l Co. v. Hoover–NSK Bearing Co.*, 635 F.2d 1222 (7th Cir.1980)).

*Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir. 1988).

■ Here, the court's instructions regarding breach of fiduciary duty, although not specifically tracking the language of the Oklahoma cases, clearly provided the jury with an understanding of the issues and the standards to apply. The instructions convey to the jury conditions which may create an unequal relationship between a broker-dealer and a client, and indicate that a fiduciary duty exists when the party in the weaker position reasonably places its confidence and responsibility in the party in the stronger position. The instructions further convey the idea that a breach occurs when the party in the stronger position takes advantage of and benefits from that position. The court made the instructions specific to a relationship between a broker-dealer and a client because that is the relationship at issue. We hold that the court's instructions sufficiently stated the law of Oklahoma regarding breach of fiduciary duty and provided the jury with ample understanding of the issues for their determination.

### IV.

Shearson contends that the amount of damages awarded for the breach of fiduciary duty claim was excessive and lacked support in the record. "[A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (plurality opinion) (quoted in *Specht v. Jensen*, 832 F.2d 1516, 1528) (10th Cir.1987); *see also Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1526–27 (10th Cir.1984).

■ The district court's instruction regarding the damages award was proper. We construe the Oklahoma statutory provision for noncontractual damages, Okl.Stat. Ann. tit. 23, § 61 (West 1987), broadly. *See, e.g., Sade v. Northern Natural Gas Co.*, 483 F.2d 230, 236 (10th Cir.1973); *see also King v. City of Guymon*, 523 P.2d 1154 (Okla.Ct.App.1974). Viewing the evidence in the light most favorable to the verdict, we cannot say that the award is beyond the scope of the evidence before the jury, that it shocks the judicial conscience, or that it raises an irresistible inference of passion or prejudice.

### V.

Shearson argues that the district court erred in finding that Shearson had waived its right to compel arbitration of the Oklahoma Securities Act section 408(a)(2) and breach of fiduciary duty claims. Where the dispositive facts are undisputed, the denial of a motion to compel arbitration, based on a finding of waiver, is a legal conclusion which we review de novo. *Fraser v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 817 F.2d 250 (4th Cir.1987); *Fisher v. A.G. Becker Paribas, Inc.*, 791 F.2d 691 (9th Cir.1986); *see Peterson v. Shearson/American Exp., Inc.*, 849 F.2d 464 (10th Cir.1988). The findings upon which the conclusion of waiver is based, however, are questions of fact which must be accepted unless clearly erroneous. *Reid Burton Constr. v. Carpenters Dist. Council*, 614 F.2d 698 (10th Cir.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27

(1980);[5] *Del E. Webb Constr. v. Richardson Hosp. Auth.*, 823 F.2d 145, 150 (5th Cir.1987) (quoting *Price v. Burnham Lambert, Inc.*, 791 F.2d 1156, 1159 (5th Cir. 1986)).

The trial court held that Shearson's actions, namely its delay in asserting its contractual right to arbitrate and its extensive participation in litigation, constituted a waiver of its right to compel arbitration.[6] Shearson claims that it did not waive its arbitration right because it sought arbitration of the state law claims at the earliest practicable time subsequent to the U.S. Supreme Court's decision in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). Shearson maintains that the state law claims were nonarbitrable under the "intertwining doctrine," which provided that "[w]hen arbitrable and nonarbitrable claims arise out of the same transaction, and are sufficiently intertwined factually and legally, the district court ... may in its discretion deny arbitration as to the arbitrable claims and try all the claims together in federal court." *Id.* 216–17, 105 S.Ct. at 1240–41 (footnote omitted). *Byrd* rejected that doctrine. *Id.* at 217, 105 S.Ct. at 1240. Shearson claims that the federal and state law claims were intertwined so that, until *Byrd*, it could not have sought arbitration of the state law claims because of the nonarbitrable nature of the section 12(2) claim. In *Peterson*, this court rejected Shearson's argument and stated that "[g]iven the open state of the law and the discretionary nature of the [intertwining]

doctrine, Shearson probably should have requested arbitration of the state claims at the outset." 849 F.2d at 467.

Shearson argues, however, that it moved to compel arbitration at a point when MidAmerica would have suffered no prejudice, *i.e.*, at the time the second trial was ordered but not yet tried. Shearson relies in part on the Federal Arbitration Act's strong policy favoring arbitration. *See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, —— U.S. ——, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989). It is generally true that courts will resolve "any doubts concerning ... waiver, delay, or a like defense to arbitrability" in favor of arbitration. *Nesslage v. Pork Sec., Inc.*, 823 F.2d 231 (8th Cir.1987) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983)). Further, a party alleging a waiver of arbitration bears a heavy burden of proof. *Peterson v. Shearson/American Exp., Inc.*, 849 F.2d at 466.

The *Peterson* court set forth several factors that this court must examine in determining whether a party has waived its right to arbitration:

(1) [W]hether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitra-

---

**5.** *Reid Burton Construction* does not explicitly state that the determination of waiver is a legal conclusion subject to de novo review. *See* 614 F.2d at 703 ("The findings of trial court on the defendants' conduct must be accepted unless they are clearly erroneous." "[W]e cannot say that the finding of waiver by defendants ... was clearly erroneous.") The court, however, differentiates between the standards of review for findings of fact and actual trial court decisions: "We conclude that *the court's findings here were not clearly erroneous* and that *its holding* that defendants' conduct in the court proceedings prevented assertion of their arbitration right *was not in error*." *Id.* (emphasis added). We, therefore, interpret *Reid Burton Construction* as reviewing the issue of waiver de novo in accord with Tenth Circuit law.

**6.** "Defendants' activities in the lawsuit, *i.e.*, their Answer, Motion for Summary Judgment, Motion for Directed Verdict, and the entire discovery process, are all devoid of any mention, much less an assertion, of the contractual right to arbitrate. Defendants' purposeful taking advantage of and enjoining the benefits of federal court litigation cannot now be followed by an afterthought attempt to shift the lawsuit into arbitration for what appears to be the limited purpose of gaining a more favorable forum for the remaining claims." *MidAmerica Sav. & Loan Ass'n. v. Shearson/American Exp., Inc.*, No. 84–L–10–C (N.D.Okla. Feb. 5, 1986) (order denying motion to compel arbitration.).

tion enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Id.* at 467–68 (quoting *Reid Burton Constr.* 614 F.2d at 702).

■ Applying these factors to the facts in this case, we find that Shearson's actions showed an intent to waive its right to arbitration. First, Shearson acted inconsistently with an intent to arbitrate by engaging in extensive litigation and delaying its attempt to compel arbitration until after the completion of one full trial and the resolution of post-trial motions. Second, Shearson's partial success at the first trial, winning verdicts on five claims against it, proves that it fully and effectively invoked the "litigation machinery." Third, Shearson sought arbitration after a delay of more than twenty months and did not seek a stay at any time during that period. Fourth, although Shearson filed no counterclaims, it participated in all steps necessary to litigation, including the entire discovery process. Upon examination of these four factors alone, it is obvious that Shearson intended to utilize the judicial system rather than the arbitration process to resolve the claims against it.

Finally, with respect to Shearson's contention that MidAmerica would not be prejudiced by arbitration, the facts indicate that MidAmerica had already been prejudiced by Shearson's actions. First, procedures not available in arbitration, such as common discovery steps, had been undertaken by both parties. Second, MidAmerica expended the time and effort necessary to participate in full litigation. It is difficult to say that MidAmerica has not been affected or misled. *See Peterson*, 849 F.2d at 468 (holding that appellant's delay in filing a motion to compel arbitration until four months after the *Byrd* decision and

approximately five weeks prior to the re-scheduled trial date "affected and probably misled" appellee, who had already prepared for trial); *Reid Burton Constr.*, 614 F.2d at 103 (holding that defendant's request to arbitrate on the day of trial constituted sufficient prejudice for waiver of arbitration). We hold that Shearson waived its right to arbitrate the pendent state law claims.

## VI.

■ Shearson contends that the trial court erred in failing to instruct the jury on Shearson's theories of the case and affirmative defenses. These include: imputation to MidAmerica of knowledge of the contents of the prospectuses; waiver; laches and ratification; ramifications of MidAmerica's removal of the hedges; MidAmerica's waiver of entitlement to rescissionary damages; and application of Oklahoma Securities Act section 408(f). *See* Okla.Stat. tit. 71, § 408(f) (1987) (current version at Okla. Stat. tit. 71, § 408(i) (Supp.1989)). A party is entitled to an instruction based on their theory of the case only if (1) the instruction is legally correct; (2) the theory is supported by the evidence; and (3) the desired instruction is brought to the court's attention in a timely manner. *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 n. 10 (5th Cir.1985); *see also Bold v. Simpson*, 802 F.2d 314, 318 (8th Cir.1986) (party entitled to instruction if legally correct and supported by evidence); *Higgins v. Martin Marietta Corp.*, 752 F.2d 492, 496 (10th Cir.1985) (entitled to instruction on theory of case only if supported by competent evidence).

Here, Shearson's claims center largely on Shearson's requests for instructions concerning MidAmerica's receipt of statutory prospectuses and imputation to MidAmerica of knowledge of the prospectuses' contents. Because knowledge of the prospectuses may not be imputed to MidAmerica under sections 12(2) and 408, *see supra* p. 1253–56, Shearson's theories based on the alternative proposition are not legally correct. Shearson was thus not entitled to instructions based on such theories.

Similarly, a review of the record and applicable law reveals that Shearson's additional requests for instructions articulating Shearson's theories of the case and affirmative defenses either lack basis in the law or support in the record. We find no merit in Shearson's claims.

### VII.

Shearson claims that, after giving an erroneous section 12(2) instruction, the district court erred in ordering a partial new trial on that claim alone. Shearson argues that the instructional error impacted on the jury's ability to fairly determine the other claims, and that the court should therefore have ordered a complete new trial.

Whether a new trial should be granted is a decision left to the informed discretion of the district court, which is in a better position to evaluate claims of jury confusion or other error. *Mid–West Underground Storage, Inc. v. Porter,* 717 F.2d 493, 502 (10th Cir.1983). We review a trial court's grant or denial of a new trial under an abuse of discretion standard. *Id.; National R.R. Passenger Corp. v. Koch Indus., Inc.,* 701 F.2d 108, 110–11 (10th Cir.1983); *Thompson v. Kerr–McGee Refining Corp.,* 660 F.2d 1380, 1388 (10th Cir.1981).

Rule 59(a) of the Federal Rules of Civil Procedure recognizes the court's power to order a partial new trial: "A new trial may be granted to all or any of the parties and on all or part of the issues...." "A new trial on part of the issues is appropriate where 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" *K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1163 n. 22 (10th Cir.1985) (quoting *Gasoline Prods. Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931)).

Shearson maintains that the section 12(2) instructional error prejudiced the jury's determination of the other two claims, particularly the Oklahoma section 408(a)(2) claim which has statutory language similar to section 12(2). We disagree. Here the trial court was careful to separate the three claims for the jury's determination in the instructions, and it directed the jury to consider damages separately for each cause of action. In addition, the jury returned three different verdict amounts, thus demonstrating its separate consideration of each claim. *See Stoetzel v. Continental Textile Corp. of Am.,* 768 F.2d 217 (8th Cir.1985). Following the Supreme Court's direction that "appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct," *Fairmount Glass Works v. Cub Fork Coal Co.,* 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439 (1933), we hold that the district court did not abuse its discretion in refusing to order a complete new trial.

### VIII.

We conclude that the court did not err in denying defendants' motions for directed verdict or judgment notwithstanding the verdict, motion for new trial, and motion to compel arbitration. We conclude that the trial court did not err in refusing to order a complete new trial or in concluding that the award of damages was neither excessive nor unsupported by the record. We further conclude that the court properly instructed the jury as to the applicable law. We AFFIRM.