In re Dale Elmer PETERSEN d/b/a
Blackwell Livestock
Auction, Debtor.

NATIONAL BONDING AND
ACCIDENT INSURANCE
COMPANY, Plaintiff,

v.

Dale Elmer PETERSEN, Defendant.

Bankruptcy No. 83–10468.
Adv. No. 83–0664.

United States Bankruptcy Court,
D. Kansas.

Aug. 1, 1985.

James R. Hanson, Wichita, Kan., for plaintiff.

Harry L. Depew, Neodesha, Kan., for debtor/defendant.

### AMENDED MEMORANDUM OF DECISION

ROBERT B. MORTON, Bankruptcy Judge.

### PROCEDURAL STATUS

Plaintiff has timely moved, under Fed.R. Civ.P. 59(e), as incorporated by Bankruptcy Rule 9023, to alter or amend this judgment for defendant entered March 7, 1985.

### FACTS

From the evidence presented, the pleadings, and statements of parties through counsel, the material facts are established and may be stated in narrative.

The debtor/defendant (debtor) owned and operated the Blackwell Livestock Auction in Blackwell, Oklahoma, as an individual proprietor. The business was in operation for approximately fifteen months from

July 1981 to October 13, 1982. Debtor's *modus operandi* was to receive livestock on consignment, sell the animals at auction, deduct his sales commission and remit the net proceeds to the consignor. As a market agency subject to the provisions of the Federal Packers and Stockyards Act, he complied with the regulatory requirement of maintaining a custodial account into which proceeds from the sale of consigned livestock were placed. Withdrawals from this account were to be made solely to pay the consignors and costs associated with the sale. In further pursuance of the Act, debtor engaged plaintiff, National Bonding and Accident Insurance Company (National Bonding), as the account surety. National Bonding thereby became the guarantor for debtor's compliance with the Act. The principal amount of the bond at all relevant times was $55,000. The bond was terminated effective October 13, 1982.

The custodial account and another separate business account were maintained at the First National Bank (Bank) in Braman, Oklahoma. Commencing in the summer of 1981, debtor issued proper checks on the custodial account for a period of fifteen months without incident. In October of 1982, however, certain checks aggregating $51,763.50 were refused by Bank and returned unpaid to shippers/consignors. According to Bank's records the account balance was so reduced that the checks could not be honored. However, Bank itself was the primary immediate cause of that insufficiency.

In mid-October, apparently due to knowledge of the bond termination and concern for amounts debtor owed on other business accounts, Bank, on its own, made a series of setoffs against the custodial account. There is evidence of an established pattern of some delay by debtor in depositing checks which, however, had not resulted in

any refusal of payment by Bank before October 1982.

Following Bank's refusal of the October checks, shippers asserted claims against National Bonding as the guarantor. On January 20, 1983, National Bonding sent copies of the claims to the debtor for review and advice. Debtor made no response. In April 1983, National Bonding paid the full amounts of the respective claims. Releases and assignments were obtained from all claimants.

Debtor acknowledges that the financial transactions involving his custodial account were puzzling and admits he cannot account for all of the money exchanges made during those last weeks in October—nor does Bank provide much enlightenment. The Court accepts debtor's testimony that he believed deposits from sale proceeds sufficient to cover all outstanding checks were made by October 26. The Court further finds debtor did believe, and had a reasonable basis for believing, the purchase of livestock for his own account was accomplished with funds borrowed from Bank and deposited, without restriction, in business accounts other than the custodial account in question.

### RELIEF SOUGHT

Plaintiff seeks to have $20,463.12 of its outlay determined nondischargeable. The requested relief is premised on the contention that there was a defalcation by debtor in that amount while he was acting in a fiduciary capacity within the ambit of section 523(a)(4).[1] Plaintiff perceives the deficiency in the custodial account to have resulted either from debtor's failure to deposit funds or his wrongful withdrawals. There are general allegations of self-dealing by debtor to the detriment of the custodial account. National Bonding also seeks $2,858.93 for attorney fees incurred in the litigation.

---

1. The remainder of the total amount disbursed by plaintiff under the bond was previously recouped due to the errors committed by Bank. These errors led to the following recoveries: 1) $12,799.17—checks improperly held beyond midnight deadline, in violation of the Oklahoma version of Uniform Commercial Code section 4–302 (partial recovery of $8,095.21 to surety); 2) $1,361.39—improper setoff; and 3) $21,843.77—check wrongfully removed from custodial account.

## ISSUES

1) Whether the debtor was acting in a fiduciary capacity.

2) Whether the conduct of the debtor amounted to a defalcation warranting the non-dischargeability of the debt.

## MEMORANDUM

■ National Bonding's challenge to dischargeability is brought under section 523(a)(4) of the Bankruptcy Code,[2] which provides:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny....

11 U.S.C. § 523(a)(4). The burden of proof in a section 523 action is on the party seeking relief. Bankr. Rule 4005. Exceptions to discharge are narrowly construed so that the burden on the objecting creditor is substantial. *See In re Hirsch*, 36 B.R. 643, 644 (Bankr.S.D.Fla.1984). Resolution of the instant issues involves a two-step analysis: 1) whether the debtor was acting in a fiduciary capacity; and 2) if a fiduciary, whether the debtor committed an act of defalcation. *See In re Cowley*, 35 B.R. 526, 527, 528 (Bankr.D.Kan.1983).

### Fiduciary Capacity

■ The owner of a livestock auction is a market agency and is subject to the Packers and Stockyards Act.[3] One purpose of the Act is to insure proper handling of shippers' funds and their proper transmission to shippers. *Bowman v. United States Department of Agriculture*, 363 F.2d 81, 85 (5th Cir.1966). The provisions are implemented through rules and regulations promulgated by the Secretary of Agriculture. Regulations require stockyard owners to maintain custodial accounts [4] and section 204 of the Act mandates that a guarantor be furnished for the account. These trust accounts [5] are designed to safeguard proceeds of livestock against losses suffered in instances of insolvency.

■ Clearly, the intent of the Secretary was to place the stockyard operator in a fiduciary position. *In re Matheson*, 10 B.R. 652, 654 (Bankr.S.D.Ala.1981). A statutory trust was created by the Act [6] and this Court determines that debtor was acting in a fiduciary capacity *vis-a-vis* the shippers and, in this instance, as to National Bonding which succeeded to the shippers' rights by assignment and subrogation.

### Defalcation

■ Defalcation, in the present context, does not have a precise definition and there is no legislative history or comment to aid the interpretation. The term has been construed more broadly than "embezzlement" or "misappropriation." 3 *Colliers on*

---

**2.** Concern has been expressed that National Bonding is not the proper party plaintiff. Under section 501(b) and Rule 304, National Bonding, as guarantor, can bring the action. *See In re Matheson*, 10 B.R. 652 (Bankr.S.D.Ala.1981).

**3.** "The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services...." 7 U.S.C. § 201(c).

**4.** 9 C.F.R. § 201.42. "Every market agency and licensee engaged in selling livestock or live poultry on a commission or agency basis shall establish and maintain a separate bank account designated as 'Custodial Account for Shippers; Proceeds,' or by some similar identifying desig-nation, under terms and conditions with the bank where established, to disclose that the depositor is acting as a fiduciary with respect thereto and that the funds in the account are trust funds." *Id.*

**5.** "Each payment that a livestock buyer makes to a market agency selling on commission is a trust fund. Funds deposited in custodial accounts are also trust funds." 9 C.F.R. § 201.-42(a).

**6.** The concept of fiduciary capacity under section 523(a)(4) is limited to technical trusts and not to those implied by law. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *American Ins. Co. v. Lucas*, 41 B.R. 923 (Bankr.W.D.Pa.1984).

*Bankruptcy* ¶ 523.14, at 523–96 (15th ed. 1984). The semantical difficulties were addressed by Judge Learned Hand in *Central Hanover Bank & Trust v. Herbst*, 93 F.2d 510 (2d Cir.1937):

> Colloquially perhaps the word, 'defalcation,' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts.... We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; in *In re Bernard*, 87 F.2d 705, 707, we said that 'the misappropriation must be due to a known breach of duty, and not to mere negligence or mistake.' Although that word probably carries a larger implication of misconduct than 'defalcation,' 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does. *All we decide is that when a fiduciary takes money* upon a conditional authority which may be revoked and knows at the time it may, he is guilty of a 'defalcation' though it may not be 'fraud,' or an 'embezzlement,' or perhaps not even a 'misappropriation.'

*Id.* at 511–12 (emphasis supplied) (cited with approval in *In re Seaton*, Case No. 81–11347 (Bankr.D.Kan. Feb. 13, 1983)). Cases interpreting section 523(a)(4) hold that it is unnecessary to prove an intentional wrong by the debtor *where the debtor himself appropriates the funds. See In re Gonzales*, 22 B.R. 58 (Bankr.App. 9th Cir.1982); *In re Guy*, Case No. 82–10477 (Bankr.D.Kan. Mar. 21, 1983). This Court views the underscored qualification of the foregoing proposition important where, as here, control of the funds was shared with and exercised by a third party.

National Bonding places principal reliance on *In re Matheson*, 10 B.R. at 652. There the debtor was a market agency under the Packers and Stockyards Act and, like debtor here, was required to maintain a custodial account under Department of Agriculture Regulation 9 C.F.R. § 201.42. However, the case is distinguishable in that Matheson, the debtor, was the *only* actor in an improper withdrawal of funds from the custodial account. *Matheson* does not deal with the instant situation where the appropriation of custodial account funds was by a third party for the third party's own benefit. The abstract definition of defalcation, set out in the opinion, clearly seems to contemplate an act by the debtor alone. National Bonding's argument, by extension, would disregard the actual cause of the account deficiency and hold such a debtor absolutely liable upon the mere showing of the dishonor of a consignor's check. That incorrect premise may be the reason for the insufficiency of National Bonding's evidence here. However that may be, the proof adduced by National Bonding falls short of meeting plaintiff's burden. National Bonding's supplemental memorandum would shore up its case by treating some of the opinions and conclusions in the government agency report[7] as conclusive evidence. But the document was not admitted with that effect nor was the author brought forward for testimony and cross-examination. At trial debtor's counsel made it clear that the opinions and reasoning stated in the report were not to be accorded any evidentiary weight. The Court adopted that reservation without objection on the part of plaintiff.[8] Thus the report only stands as confirmation that there was in fact a shortage in the custodial account and the government agency so determined. The report does not constitute proof, one way or the other, as to how or why the shortage occurred.

In the matter at hand the Court finds that debtor complied with the Act by maintaining a custodial account and furnishing a surety. The evidence does not preponderantly establish debtor's self-dealing with custodial funds.[9] Debtor did buy live-

---

7. Packers and Stockyards Administration Investigative Report, Exhibit 5.

8. Partial transcript of trial proceedings, file document No. 128.

9. The Court applies the 'preponderant' standard here. In cases of fraud, Kansas follows the more stringent test of 'clear and convincing' evidence. *See* PIK 2d 2.11.

stock for his own account at his own auction. However, the evidence shows that he had borrowed money from Bank for noncustodial accounts which he reasonably believed was available to purchase livestock for himself. That pattern of conduct had been followed by debtor and Bank in their mutual regular course of business and prevailed without event until Bank's unilateral setoffs in October 1982, some of which were improper.[10] In any case, National Bonding has not met its burden of proving debtor himself misappropriated custodial funds in the amount claimed and thereby committed an act of defalcation. Upon reconsideration, the judgment for debtor as filed and entered March 7, 1985 stands affirmed in accordance with the foregoing memorandum which constitutes findings of fact and conclusions of law as required by Bankruptcy Rule 7052 and Rule 52(a), Federal Rules of Civil Procedure.