In re William Lee TURNER, d/b/a
William Lee Turner Construction
and Vickie Turner, Debtors.

DISCOUNT HOME CENTER,
INC., Plaintiff,

v.

William Lee TURNER, Defendant.

Bankruptcy No. 90–01925–W.
Adv. No. 90–0257–W.

United States Bankruptcy Court,
N.D. Oklahoma.

Dec. 4, 1991.

Dennis J. Watson, Miami, Okl., for plaintiff.

Mary K. Holt, Tulsa, Okl., for defendant.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

This adversary proceeding was submitted for decision on stipulated facts and briefs. Upon consideration thereof, the

Although the parties do not so stipulate, it is alleged in the complaint and admitted in the answer, and the Court accordingly finds, as follows:

"... That [Discount] initiated an action against [Turner] ... and Davis in the District Court of Ottawa County, Oklahoma, for judgment in personam as to [Turner] and to foreclose its materialmen's lien," complaint ¶ 9, answer ¶ 1.

"[That o]n the 5th day of July, 1990, [Discount] obtained a Journal Entry of Judgment for the prayer sought in the District Court of Ottawa County, Oklahoma," complaint ¶ 10, answer ¶ 1.

## CONCLUSIONS OF LAW

The parties stipulate, and the Court determines, that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), 11 U.S.C. § 523(a)(4), (6).

Discount asserts that the debt of $6,604.47 plus interest, owed to Discount by Turner, is nondischargeable or excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) or (6).

Discount makes no argument in furtherance of its cause under 11 U.S.C. § 523(a)(6). This cause is either abandoned or unsupported, and will not be further considered in this opinion. Discount does, however, argue in furtherance of its cause under 11 U.S.C. § 523(a)(4).

11 U.S.C. § 523(a)(4) provides that "A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

The statute requires, first, that there be a "debt," which in turn means liability on a claim of right to payment, 11 U.S.C. § 101(5), (12). The parties stipulate that "Turner incurred the sum of $6,604.47, plus interest ...," and appear to assume without expressly stating that such "sum" remains due and owing and is claimed by Discount. Thus there is a "debt" owed by Turner to Discount.

Discount's complaint asserted, among other things, "embezzlement," complaint p. 3 ¶ 11(c). But Discount's brief argues only "fraud or defalcation while acting in a fiduciary capacity;" and in any event the parties do not stipulate to facts necessary to support a determination of "embezzlement," in particular regarding intentional or felonious conduct, *In re Wallace*, 840 F.2d 762, 764–765 (10th Circ.1988); 26 AM. JUR.2D (1966) "Embezzlement" §§ 1, 19. Discount's original assertion of "embezzlement" is either abandoned or unsupported, and will not be further considered in this opinion. The Court proceeds to consider Discount's assertion of "fraud or defalcation while acting in a fiduciary capacity."

■ The terms "fraud or defalcation" are both qualified by the phrase "while acting in a fiduciary capacity," 3 *Collier on Bankruptcy* (15th ed. 1991) ¶ 523.14[c] p. 523–106. There is no need to consider whether debtor has committed "fraud or defalcation" unless it is first determined that debtor was "acting in a fiduciary capacity."

Discount asserts that a "fiduciary capacity" arises under 42 O.S. §§ 152, 153. Those statutes currently provide in pertinent part as follows:

### § 152. Proceeds of building or remodeling contracts, ... as trust funds for payment of lienable claims

(1) The amount payable under any building or remodeling contract shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract.

.    .    .    .    .

### § 153. Payment of lienable claims

(1) The trust funds created under Section 152 of this title shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable

claims due and owing or to become due and owing shall have been paid.

(2) Any person willfully and knowingly appropriating such trust funds to a use not permitted by subsection (1) of this section, upon conviction, shall be guilty of embezzlement and shall be punished by imprisonment in the State Penitentiary for a period not to exceed five (5) years or by a fine not to exceed Ten Thousand Dollars ($10,000.00), or by both such imprisonment and fine.

. . . . .

(4) The existence of such trust funds shall not prohibit the filing or enforcement of a labor, mechanic or materialmen's lien against the affected real property by any lien claimant, nor shall the filing of such a lien release the holder of such funds from the obligations created under this section or Section 152 of this title.

Of course, these State statutes have no direct applicability in Federal bankruptcy matters. The issue is whether the arrangement prescribed by 42 O.S. §§ 152, 153 should be recognized as a "fiduciary capacity" within the meaning of 11 U.S.C. § 523(a)(4).

■ The issue must be solved by applying some legal standard; but whose law supplies the standard is not clear. The relation between non-bankruptcy law such as 42 O.S. §§ 152, 153 and bankruptcy law in 11 U.S.C. § 523(a)(4) is defined by such vague formulae as the following: "the question of fiduciary status ... is one of federal law, [but] state law is an important factor in determining when a trust relationship exists," *In re Black*, 787 F.2d 503, 506 (10th Cir.1986). Apparently both State and Federal law must be consulted, and somehow accommodated, to determine whether a given relationship is or is not a "fiduciary capacity" for purposes of 11 U.S.C. § 523(a)(4).

The Court of Appeals of this Circuit has recently summarized Oklahoma law on the subject of what makes a "fiduciary relationship," as follows:

Oklahoma courts have not given a precise definition of a fiduciary relationship,

see *MidAmerica Federal Sav. & Loan Ass'n v. Shearson/American Exp., Inc.*, 886 F.2d 1249, 1257 (10th Cir.1989), but have held that the relationship arises whenever

there is confidence reposed on one side and resulting domination and influence on the other.... [The] relationship springs from an attitude of trust and confidence and is based on some form of agreement, either expressed or implied, from which it can be said the minds have been met to create a mutual obligation.

*Lowrance v. Patton*, 710 P.2d 108, 112 (Okla.1985) (citations omitted). *See also MidAmerica Federal Sav. & Loan Ass'n*, 886 F.2d at 1257 (quoting *Lowrance*). Another Oklahoma court described the relationship as occurring " 'when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible.' " *In re Estate of Beal*, 769 P.2d 150, 155 (Okla.1989) (quoting *In re Null's Estate*, 302 Pa. 64, 153 A. 137 (1937)).

Oklahoma courts have never applied these general principles to a manufacturer-dealer contract; however, the same courts have held that fiduciary relationships are not limited to any specific legal relationship. *See In re Estate of Beal*, 769 P.2d at 155 (" 'equity will never bind itself to any hard and fast definition of the phrase 'confidential relation' ' ") (quoting *Egr v. Egr*, 131 P.2d 198 (Or. 1942)); *Lowrance*, 710 P.2d at 111 (no "bounds to the facts and circumstances out of which a fiduciary relationship may spring"). Instead, fiduciary duties may arise anytime the facts and circumstances surrounding a relationship "would allow a reasonably prudent person to repose confidence in [another person]." *In re Estate of Beal*, 769 P.2d at 155. Therefore, ... we must conclude that Oklahoma courts would recognize a fiduciary relationship arising out of a

manufacturer-dealer contract if the transaction involved the facts and circumstances indicative of the imposition of trust and confidence.

Certainly, most contracts involve a degree of the factors indicative of reposed trust and confidence. For example, all contracts ultimately involve mutual intent, and many involve disparate bargaining power; however, only those instances which involve a veritable "substitution of the will of the defendant for that of the plaintiff in material matters involved in the transaction" will give rise to fiduciary duties. *Sellers v. Sellers*, 428 P.2d 230, 236 (Okla.1967) (citing *Derdyn v. Low*, 220 P. 945 (Okla.1922)). This ensures that common commercial dealings are not subject to heightened fiduciary responsibilities. As we have held, parties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties. *See Appleman v. Kansas–Nebraska Natural Gas Co.*, 217 F.2d 843, 848–49 (10th Cir.1955) ("Mere concert of action, without more, does not establish a fiducial relationship.... It is only when by their concerted action they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiducial relationship arises.") (citations omitted). Our inquiry ... is to determine whether the evidence ... is indicative of a normal commercial dealing, or, on the other hand, whether the evidence is susceptible to any inference ... of a fiduciary relationship.

*Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 729–730 (10th Circ.1991). Such a broad definition of "fiduciary relationship" includes, but is not limited to, formal legal "trusts."

■ The word "trust" has two different senses. In its broadest sense, it is "synonymous with 'confidence' or 'fiduciary relationship,'" 76 AM.JUR.2D "Trusts" § 2 pp. 247–248, and includes any situation in which one party "trusts" or confides in another. In its narrower sense, it designates a particular *kind* of fiduciary relationship, namely "the legal relationship between one person having an equitable ownership in property and another person owning the legal title to such property," *id.*

An "express" trust is a trust intentional in fact, i.e. a trust the parties themselves deliberately intended to create, 76 AM. JUR.2D, supra, § 4 p. 250. The term "express" is unfortunate, since the parties' intention may be inferred from circumstances, *id.* § 38 p. 285, §§ 189–190 pp. 423–424. So-called "express" trusts are better designated "voluntary" trusts, *id.* Such "voluntary" trusts include trusts which are literally "express" or formally declared by the parties, and also trusts whose intended creation is inferred from circumstances or "implied in fact." All of them are distinguished from "involuntary" trusts or trusts "by operation of law," which the law imposes on parties regardless of their intention, *id.* Such "involuntary" trusts are usually declared or imposed by courts of equity, either to protect equitable ownership severed from legal title under circumstances short of fraud ("resulting trusts" or "trusts implied in law"), or to prevent unjust enrichment by fraud or serious dereliction of duty ("constructive trusts" or "trusts *ex maleficio*" i.e. "arising from a wrong"), *id.* §§ 196–198, 221–222. Traditional voluntary trusts are trusts in the narrow sense. But resulting and constructive trusts may be mere "confidences" which the law exalts into full-blown "trusts" for remedial purposes.

Modern notions of special fiduciary occupations and statutory trusts do not fit comfortably within this traditional classification. They might be a sort of resulting trust, imposed by courts or by statute on parties who stand in a particular relationship to each other, e.g. managing partner to other partners, broker to investor, or contractor to owner and subcontractor or materialman. Such trusts are not voluntary, in that they are imposed by law whether or not the parties intended to create a "real" trust. But they are not *ex maleficio* either, for they arise from a commitment to a relationship and not from the commission of a wrong.

The Bankruptcy Act of 1841 excepted from discharge "debts ... created in consequence of a defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity." The plain meaning of this

provision seems to be that anything fairly describable as a "fiduciary capacity," including but not limited to "trusts" in any narrow sense, would be within the statute and excepted from discharge. In *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), the U.S. Supreme Court ruled that the statute did not mean what it said. The issue before the Court was whether a debt owed by a factor (a professional middleman or consignee) to his principal should be discharged. The Court observed that the examples listed in the statute

> are not cases of implied, but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act,

*id.*, 43 U.S. p. 207, 11 L.Ed. p. 238. That is, the Court invoked the rule of *ejusdem generis* to narrow the meaning of "fiduciary capacity" to that of "special trusts" or "technical trusts."

The Court did not say just what "special trusts" or "technical trusts" are. "Special trusts" appear to be "active trusts," i.e., all trusts in which the trustee has affirmative duties or real powers and is not merely a passive depositary of the trust estate, *Black's Law Dictionary* (5th ed. 1979) pp. 1355–1356, *Words & Phrases* (West Pub. Co.1953) "Special Trust" pp. 380–382. What a "technical trust" is does not readily appear. Courts of Appeal would later assume that a "technical" trust is an "express" trust, see infra. The assumption is plausible enough; but what the U.S. Supreme Court really meant by the term is open to question.

The Bankruptcy Act of 1867 excepted from discharge any "debt created by the fraud or embezzlement of the bankrupt, by his defalcation as a public officer, or while acting in any fiduciary character." Congress removed the list of specific examples found in the 1841 statute, thereby rendering *ejusdem generis* inapplicable and apparently changing the result of *Chapman v. Forsyth*. But in *Neal v. Clark (Neal v.*

*Scruggs)*, 95 U.S. 704, 24 L.Ed. 586 (1878), the Supreme Court invoked the ruling of *Chapman v. Forsyth*, as if nothing had changed. This careless remark seems to have been dictum, since the real issue was the definition of "fraud" rather than of "fiduciary capacity." The Court went on to hold that "the 'fraud' referred to ... means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong ... and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality," *id.* 95 U.S. p. 709, 24 L.Ed. p. 587.

This dictum was repeated in *Hennequin v. Clews*, 111 U.S. 676, 4 S.Ct. 576, 28 L.Ed. 565 (1884) and *Noble v. Hammond*, 129 U.S. 65, 9 S.Ct. 235, 32 L.Ed. 621 (1889). In *Hennequin v. Clews*, the Court admitted that its very narrow construction of the exception to discharge was at variance with English practice, but explained the difference as "due to the peculiar modes and habits of business prevailing among our peoples," 111 U.S. p. 682, 4 S.Ct. p. 579, 28 L.Ed. p. 568. In *Noble v. Hammond*, the Court discharged a produce dealer acting as a collection agent who mingled "trust" funds with his own and lost both. The Court declared that "[e]ven if the agreement between the parties might be construed as creating a trust in some sense, it was clearly not such a trust as comes within the provisions of the bankrupt act," *id.*— although why this is "clear" is not clear. In both cases, there was no "positive fraud," so that remarks on the meaning of "fiduciary capacity" might be taken as dicta. The Court did not discuss whether the phrase "while acting in any fiduciary character" modified "fraud or embezzlement of the bankrupt," or "defalcation as a public officer," or both or neither of them.

In *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891), the Supreme Court discharged a debt owed by an individual expressly designated as "trustee" in a written document, holding that "[t]he relation created was merely the usual one of contract between debtor and creditor," 138 U.S. p. 375. The Court found no true trust because the bankrupt was

the owner of the $10,000 in his own right. He had the right to use the money in any way he thought proper ... there was no obligation upon him to keep it separate from his own money, or to put upon it any marks of identification, or to invest it in any particular securities ... Within the meaning of the exception in the bankruptcy act, a debt is not created by a person while acting in a 'fiduciary character,' merely because it is created under circumstances in which trust or confidence is reposed in the debtor, in the popular sense of those terms,

*id.* But the Court for the first time stated a new and somewhat different rationale for its ruling, as follows:

In *Cronan v. Cotting*, 104 Mass. 245, it was held, that the provision of section 33 of the bankruptcy act of 1867, excepting from ... discharge debts created by the bankrupt while acting in any fiduciary character ... implied a fiduciary relation existing previously to, or independently of, the transaction from which the excepted debt arose; and that [otherwise] almost all pecuniary obligations, especially those implied by law, would be included in the ex[ception to discharge]. The Court said: "The debt, in this case, arose exclusively out of a single transaction between the parties. Its creation involved no element other than that of contract. The existence of the liability did not spring from any breach of trust. The only default consisted in the nonpayment of the balance due ... after satisfying the purpose of the pledge. The debt did not result from, but preceded, that default." In the present case, the debt ... preceded his default, and was not created by his failure to carry out the provisions of the mandate.

It is to be noted that the language of section 33 of the act of 1867 excepts debts created by the bankrupt "while acting in any fiduciary character;" and the language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created. In this view, it was said in *Cronan v. Cotting, supra:* "We are inclined to the opinion that the phrase implies a fiduciary relation existing previously to, or independently of, the particular transaction from which the debt arises,"

138 U.S. pp. 377–378, 11 S.Ct. p. 317–18, 34 L.Ed. pp. 935–936. The passage is confusing: the Massachusetts Supreme Court begins by talking about debt which preceded default, and ends by talking about fiduciary relation which preceded debt. It is at least clear that the U.S. Supreme Court construed the exception to discharge to "apply only to a debt created by a person who was already a fiduciary when the debt was created," *id.* This new test concerns the timing, rather than the technical character, of the trust. Under the traditional classification of trusts, these two tests amounted to the same thing, because involuntary trusts (resulting or constructive) were remedial devices imposed on a situation after default had occurred, so that the debt naturally preceded the "trust." As in previous cases, it also appeared that there was no "positive fraud," merely financial failure.

In the Bankruptcy Act of 1898, Congress rephrased the statute again. Act § 17 provided that

A discharge in bankruptcy shall release the bankrupt from all of his provable debts, except such as ... (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer, or in any fiduciary capacity.

This statute might have been merely an over-punctuated restatement of former § 33 of the Act of 1867. But the commas strewn about the text make its meaning unclear. In *Crawford v. Burke*, 201 Ill. 581, 66 N.E. 833 (1903), rev'd by 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147 (1904), the precise issue was the *scope of application* (not the meaning) of the phrase "in any fiduciary capacity." The Illinois Supreme Court read the penultimate comma as "indicating a severance of that which precedes from that which follows," *id.* 195 U.S. p. 192, 25 S.Ct. p. 12, 49 L.Ed. p. 153. As a result, the phrase "in a fiduciary capacity" modified only "defalcation" and not "fraud,

embezzlement, [or] misappropriation," so that any debt created by fraud, embezzlement or misappropriation was excepted from discharge, whether or not the bankrupt had been acting as an officer or in any fiduciary capacity. The U.S. Supreme Court reversed, ruling that "in any fiduciary capacity" modified "fraud, embezzlement, misappropriation, [and] defalcation," so that debts for fraud not in a fiduciary capacity would be discharged. The U.S. Supreme Court admitted that "Why an ordinary claim for fraud should be released by the discharge ... is not altogether clear," *id.* 195 U.S. p. 191, 25 S.Ct. p. 12, 49 L.Ed. p. 153. But the Court retrospectively construed the Act of 1867 to have used "fraud or embezzlement" independently of "while acting in any fiduciary character;" observed that the language of the Acts of 1867 and 1898 differed in detail; and declared that

> Our own view ... is that a change in phraseology creates a presumption of change in intent, and that Congress would not have used such different language in § 17 from that used in § 33 of the act of 1867, without thereby intending a change of meaning,

*id.*, 195 U.S. p. 190, 25 S.Ct. p. 12, 49 L.Ed. p. 152. ("Such different language" consisted of a slight adjustment in word order, apparently due merely to the change in sentence structure from "Debts shall *not* be discharged *if* ..." (Act of 1867) to "Debts *shall* be discharged *unless* ..." (Act of 1898), plus addition of the term "misappropriation" which required addition of another comma. The 1867 statute constituted a much more radical "change in phraseology" from its predecessor of 1841; yet the Court had not presumed therefrom any "change in intent.") "In passing," the Court also delivered an oversimplified history of prior law on the *meaning* (not the scope of application) of "fiduciary capacity," as follows:

> We may remark here, in passing, that ever since the case of *Chapman v. Forsyth* ..., this court has held that a commission merchant and factor who sells for others is not indebted in a fiduciary capacity within the bankruptcy acts by

withholding the money received for property sold by him. This rule was made under the bankruptcy act of 1841, and has since been repeated many times under subsequent acts. *Neal v. Clark* ...; *Hennequin v. Clews* ...; *Noble v. Hammond* ...; *Upshur v. Briscoe* ...—as well as in cases in the state courts, too numerous for citation,

*Crawford v. Burke*, 195 U.S. p. 189, 25 S.Ct. p. 11, 49 L.Ed. p. 152.

In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), dicta became law. Mr. Justice Cardozo wrote for a unanimous Court on the meaning of "fraud ... while acting ... in any fiduciary capacity" in § 17(a)(4) of the Bankruptcy Act of 1898.

> The meaning of those words has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth*, ... decided in 1844, is a decision to the effect that within the meaning of a like provision in the Act of 1841 ... the statute "speaks of technical trusts, and not those which the law implies from the contract." ... the scope of the exception was limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. *Neal v. Clark* ... *Hennequin v. Clews* ... *Noble v. Hammond* ... *Upshur v. Briscoe* ... *Crawford v. Burke* ... It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J., "The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created." *Upshur v. Briscoe*, supra, 138 U.S. at p. 378, 11 S.Ct. p. 317,

293 U.S. p. 333, 55 S.Ct. p. 153, 79 L.Ed. pp. 397–398 (emphases added). This states the criteria established by prior cases, without observing that they are (or can be) two *different* criteria. *Davis v. Aetna Acceptance Co.* declares that exception to dis-

charge may occur only where debtor was a trustee of a "technical trust," as to "a debt created by a person who was already a fiduciary when the debt was created." This clearly *includes* voluntary trusts whether "express" or implied in fact; and clearly *excludes* constructive trusts *ex maleficio*. It does not clearly include or exclude resulting and statutory trusts. Mr. Justice Cardozo wrote that the exception to discharge applied only to "technical trusts," which might exclude resulting trusts. But Mr. Justice Cardozo also wrote that the exception to discharge applied where the debtor was a fiduciary "before the wrong," which might include some statutory trusts.

These problematical precedents vexed the Courts of Appeal. Several lines of Circuit-level cases developed, with particular Circuits sometimes veering from one line to another.

One line of Circuit decisions took the Supreme Court precedents at face value, assumed that "technical" trust meant "express" trust, and discharged any debt that did not clearly involve a traditional voluntary "express" trust. See *In re Adler,* 152 F. 422 (2d Circ.1907), discharging factor; *In re Harber,* 9 F.2d 551 (2d Circ.1925), discharging corporate officer; *In re Thornton,* 544 F.2d 1005 (9th Circ.1976), discharging employer in charge of employees' vacation funds; *In re Dloogoff,* 600 F.2d 166 (8th Circ.1979), discharging contractor.

Another line of Circuit decisions read the Supreme Court precedents themselves very narrowly, and excepted from discharge debts which were *either* incurred by actual fraud (without much regard for trust technicalities), *or* which involved fiduciary capacities of newfangled occupational or statutory type. See *Fulton v. Hammond,* 11 F. 291 (C.C., N.D.Ala.1882), observing difference between Acts of 1841 and 1867, distinguishing Supreme Court's decision in *Chapman v. Forsyth; Bloemecke v. Applegate,* 271 F. 595 (2d Circ.1921), observing differences among Acts of 1841, 1867 and 1898, distinguishing Supreme Court's decision in *Crawford v. Burke; In re Bernard,* 87 F.2d 705 (2d Circ.1937), excepting corporate officer's debt from discharge; *In re Hammond,* 98 F.2d 703 (2d Circ.1938), excepting corporate officer's debt from discharge; *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78 (4th Circ.1954), ruling that a "fiduciary capacity" arises "whenever the property of one person is placed in charge of another ... to be used for a specific purpose," and excepting from discharge real estate agent's debt incurred by "flagrant dishonesty," 217 F.2d pp. 80, 81; *Maguire & Co. v. Herzog,* 421 F.2d 419 (5th Circ.1970), excepting corporate officer and principal's debt from discharge; *Arnold v. Employers Insurance of Wausau,* 465 F.2d 354 (10th Circ.1972), excepting from discharge insurance company manager's debt for misappropriated premiums; *In re Romero,* 535 F.2d 618 (10th Circ. 1976), excepting from discharge contractor's debt under New Mexico statutes; *In re Harris,* 587 F.2d 451 (9th Circ.1978) adopting 458 F.Supp. 238 (D.C.Or.1976), excepting from discharge managing partner's debt incurred by "flagrant violation of a fiduciary obligation," 458 F.Supp. p. 243.

Another line of Circuit decisions admitted in principle that a debt incurred in an occupational or statutory "trust" might be non-dischargeable, but tended to allow discharge on the facts of the particular case. See *In re Vickers,* 577 F.2d 683 (10th Circ. 1978), discharging bank customer who was also bank director; *In re Angelle,* 610 F.2d 1335 (5th Circ.1980), discharging contractor; *In re Pedrazzini,* 644 F.2d 756 (9th Circ.1981), discharging contractor; *In re Cross,* 666 F.2d 873 (5th Circ.1982), discharging corporate officer from debts to creditors of corporation.

Another line of Circuit decisions attempted to reconcile all these jostling authorities by proposing that an "express" trust included any trust, even an involuntary one, "expressly" imposed by statute! See *Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Circ.1980), excepting from discharge contractor's debt under Oklahoma statutes; *In re Johnson,* 691 F.2d 249 (6th Circ.1982), excepting from discharge contractor's debt under Michigan statutes; and *In re Interstate Agency, Inc., et al.,* 760 F.2d 121 (6th

Circ.1985), excepting from discharge a debt owed by the principal of an insurance agency for premium payments under Michigan law.

In the Bankruptcy Code of 1978, the statute was rephrased yet again. 11 U.S.C. § 523(a) provides that "A discharge ... does not discharge an individual debtor from any debt—... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Legislative history indicates no intent to change prior law; but, as recounted above, "prior law" was a welter of obscure statutes and inconsistent cases. The U.S. Supreme Court has not yet attempted any interpretation of 11 U.S.C. § 523(a)(4). Meanwhile, the lower courts have struggled on.

Some Circuit-level cases under the Code have barely touched on the issue. See *Greenberg v. Schools*, 711 F.2d 152 (11th Circ.1983) aff'g and adopting 21 B.R. 1011 (S.D.Fla.1982), declaring without discussion that nondischargeability of a corporate managing director's debt to another stockholder was "clear," 21 B.R. p. 1012; *In re Thomas*, 729 F.2d 502 (7th Circ.1984), excepting from discharge a subcontractor's debt on authority of *Carey Lumber Co. v. Bell* and *In re Johnson* without even mentioning that those cases dealt with Act § 17(a)(4) and not with Code § 523(a)(4); *Klingman v. Levinson*, 831 F.2d 1292 (7th Circ.1987), involving (for once) a true "express trust" as determined by an Illinois State court judgment whose collateral estoppel effect was in issue; *In re Moreno*, 892 F.2d 417 (5th Circ.1990), wherein fiduciary capacity of a corporate officer engaged in fraudulent transfers was confessed; and *In re Tsamasfyros*, 940 F.2d 605 (10th Circ. 1991), involving an unspecified type of "fiduciary duty" as determined by an Oklahoma State court judgment whose collateral estoppel effect was in issue.

Other Circuit-level cases have generally recognized debts involving modern occupational or statutory trusts as nondischargeable in principle, but have differed over whether any given set of facts under any given combination of bankruptcy and State law was sufficient to meet the principle.

See *In re Long*, 774 F.2d 875 (8th Circ. 1985), discharging debt of guarantor-president of corporation, but apparently relaxing the stricter principle of the earlier 8th Circuit case of *In re Dloogoff; In re Teichman*, 774 F.2d 1395 (9th Circ.1985), ruling no trust existed under California law where husband held retirement benefits for ex-wife; *Ragsdale v. Haller*, 780 F.2d 794 (9th Circ.1986), ruling that trust did exist under California law as to partner in partnership; *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Circ.1986), ruling that no fiduciary capacity existed as to car dealer who misappropriated proceeds that should have been paid to lender, but citing *Maguire v. Herzog*, which excepted from discharge a debt incurred by a corporate officer and principal; *In re Black*, 787 F.2d 503 (10th Circ.1986), ruling that corporate officer owed no fiduciary duty enforceable by individual stockholders under Utah law; *In re Short*, 818 F.2d 693 (9th Circ. 1987), excepting from discharge a debt owed by a joint venturer under Washington law, and asserting that "current law" has developed beyond the simple old rule of *Chapman v. Forsyth*, 818 F.2d pp. 694–695; *In re Boyle*, 819 F.2d 583 (5th Circ. 1987), discharging contractor under Texas law because there was no misappropriation of a trust *res;* and *FDIC v. Mmahat*, 907 F.2d 546 (5th Circ.1990), excepting from discharge a malpractice debt owed by general counsel of a savings & loan institution, despite lack of evidence of misappropriation of a trust *res*—apparently limiting or overruling *sub silentio* the earlier 5th Circuit case of *In re Boyle*.

In summary, the Courts of Appeal have continued to mention the "technical trust" idea while actually concentrating on whether there was a fiduciary obligation, voluntary or otherwise, which preceded the wrong. As a result, modern statutory trusts, of a resulting-trust and not an express-trust type, have been brought within the scope of the exception to discharge.

Meanwhile, some lower courts have been pulling in the opposite direction. These courts take an unduly restrictive view of what makes an "express" trust, apparently failing to recognize that this inartful term

of art can include voluntary trusts which are not "expressed" at all but are "implied in fact." See e.g. the District Court opinion in *In re Twitchell,* 91 B.R. 961 (D.Utah 1988), rev'd 892 F.2d 86 (10th Circ.1989).

Reducing these varied precedents to an intelligible rule is not easy. For an attempt in the First Circuit involving Massachusetts law, see *In re Snyder,* 101 B.R. 822, 831–835 (B.C., D.Mass.1989). This Court must attempt the same in the Tenth Circuit involving Oklahoma law.

■ The last Supreme Court pronouncement on the subject, *Davis v. Aetna Acceptance Co.,* appears to hold that "fiduciary capacity" means *either* a "technical," presumably "express" or voluntary trust, *or* a fiduciary relationship, voluntary or involuntary, which exists before any wrongdoing. *Hamby v. St. Paul Mercury Indemnity Co.* appears to hold that a "fiduciary capacity" arises "whenever the property of one person is placed in charge of another ... to be used for a specific purpose," and can be implied or imposed by law in some (though not all) business relationships. *Davis* and *Hamby* are both invoked by *In re Romero,* which holds that a "fiduciary capacity" may be imposed by statute as well as by case law, "independent of any express understanding" among the parties, at least where "a comprehensive scheme for the issuance of licenses to those engaged in the construction industry ... clearly imposes a ... duty upon contractors who have been advanced money pursuant to construction contracts ... binding upon [a contractor] prior to any dealings he had with [any particular customer]." These precedents are binding on this Court; and their principles must be applied to the facts and the Oklahoma statutes now before this Court.

The Oklahoma statutes impose a "trust" regardless of any actual understanding among the parties, hence do not involve a voluntary or express trust in the traditional sense. This "trust" arises when property (money) of one person (homeowner) is paid to another (contractor) to be used for a specific purpose (to pay lienable claims of subcontractors or materialmen before paying other expenses or the contractor him-

self), hence is a "fiduciary capacity" within the rule of *Hamby* and *Romero.* The Oklahoma statutes are part of an extensive "scheme" regulating dealings among property-owners, contractors, subcontractors, materialmen and others who work on realty or its improvements; and they clearly impose a duty on contractors who have been advanced money pursuant to construction contracts. Unlike the New Mexico "scheme" in *In re Romero,* Oklahoma's "scheme" does not require prior licensing of contractors; so it cannot be said that the fiduciary duty arose before any dealings whatsoever between the parties. But Oklahoma's "scheme" clearly provides that the fiduciary duty exists "upon receipt" of funds, 42 O.S. § 152(1), and is not merely constructed after the contractor's failure to retire lienable claims—hence it exists before any wrongdoing, as required by *Davis.*

Although the Oklahoma statutory contractor's trust is distinguishable in detail from the legal "scheme" in *In re Romero,* those distinctions make no difference. The Oklahoma statutory contractor's trust is well within the rules of *Davis, Hamby* and *Romero,* and accordingly is a "fiduciary capacity" within the meaning of the exception to discharge whose current version is 11 U.S.C. § 523(a)(4). Accord, *Carey Lumber Co. v. Bell,* supra, *In re Edmond,* 5 B.R. 172 (B.C., W.D.Okl.1980), *In re Fisher,* 22 B.R. 896 (B.C., W.D.Okl.1982), *In re Weaver,* 41 B.R. 649 (B.C., W.D.Okl.1984).

Turner argues that Discount's failure to give notice to the homeowner, Davis, pursuant to 42 O.S. § 142.1, renders Discount's lien unenforceable and somehow negates Turner's fiduciary capacity as to Discount. Failure to comply with statutory requirements as to enforceability and perfection of liens may impair the lien, *Bohn v. Divine,* 544 P.2d 916 (Okl.App.1975), *C & C Tile and Carpet Company, Inc. v. Aday,* 697 P.2d 175 (Okl.App.1985), *In re Tefertiller,* 772 P.2d 396 (Okl.1989), and may reduce the priority of a materialman's claim upon any remaining trust funds, *In re Tefertiller,* supra. But Turner admits that an Oklahoma court gave Discount judgment *in rem* in its action to foreclose

its lien, notwithstanding failure to give notice pursuant to 42 O.S. § 142.1—although the reason for this does not clearly appear. In any event, such failure by the lien creditor does not excuse the contractor-trustee's breach of his own fiduciary duty to hold trust funds so that no liens need be created at all. The duty exists from the moment the contractor receives funds, 42 O.S. § 152(1). Subsequent misadventures of the creditor in pursuit of one remedy (the lien) need not take away the creditor's alternative remedy (available trust funds, or an award of damages for their unavailability). Whatever noncompliance with 42 O.S. § 142.1 may have done to Discount's *lien*, it does not cancel Turner's *duty*, nor remove his *debt*. The issue now before this Court concerns dischargeability of a debt owed to the supplier, not validity of a lien on the homeowner's building or priority of a claim against the balance of the trust.

■ The Court concludes that debtor was "acting in a fiduciary capacity" for purposes of 11 U.S.C. § 523(a)(4). It remains to be determined whether debtor's acts constituted "fraud or defalcation."

For purposes of 11 U.S.C. § 523(a)(4), fraud "includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality," *In re Black*, 787 F.2d 503, 505 (10th Circ.1986). The parties do not stipulate to facts necessary to support a finding of moral turpitude, intentional wrong, bad faith or immorality. Discount's assertion of "fraud" is unsupported, and will not be further considered in this opinion.

The term "defalcation" means, literally, "chopping off" or "cutting down." (It derives from the same root as the Latin nouns *falx*, a scythe, and *falcata*, a fearsome scythelike sword.) In its original legal sense, it meant setoff—i.e., "cutting down" one obligation to the extent of a reciprocal one. It came to mean "a taking away" (perhaps in the sense of the current English slang term "ripoff") or embezzlement, or "a fraudulent deficiency in funds," or "taking of money by a fiduci-

ary," or "any failure of a fiduciary to produce funds entrusted to him," or "any deficit or diminution of funds," *Black's Law Dictionary* (5th ed. 1979) "Defalcation" p. 375; *The Oxford English Dictionary* (2d ed. 1989, Clarendon Press, Oxford), Vol. 4, "Defalcate," "Defalcation" p. 369. The term has appeared in every bankruptcy Act since 1841, and since 1867 in combination with other terms such as "fraud," "misappropriation," and "embezzlement," in statutory phrases which, as discussed above, changed in some particulars from one Act to the next. The meaning "defalcation" should bear in this series of statutes has never been clear.

The first serious effort to define the term, as it was used in the 1898 Act § 17(a)(4), was made by Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Circ.1937). He observed that

> Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts,

*id.* p. 511. He reviewed the convoluted history of Act § 17(a)(4) and its predecessor statutes; described the statute's use of its various terms as "baffling ... at best," *id.* p. 512; complained with some understatement that "The authorities are not indeed very satisfactory," *id.;* and concluded with extreme caution that

> In the case at bar the bankrupt had not been entirely innocent ... though possibly one may acquit him of deliberate wrongdoing ... We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; *In re Bernard*, 87 F.2d 705, 707 [ (2nd Cir.1937) ], we said that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake." Although that word probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.

All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation,"

*id.* Later cases construing "defalcation" in Act § 17(a)(4) failed to achieve consensus; these cases are reviewed in the Bankruptcy Court opinion in *In re Twitchell,* 72 B.R. 431, 434–435 (B.C., D.Utah 1987), rev'd by 91 B.R. 961 (D.Utah 1988) which in turn was rev'd by 892 F.2d 86 (10th Circ.1989).

In the 1978 Code § 523(a)(4), "defalcation" occurs in the latest rephrasing of the old statutory formula, still in company with "fraud" and "embezzlement;" the term "misappropriation" has been dropped, but "larceny" has been added. "The term 'defalcation' as used under section 523(a)(4) does not have a precise definition and no legislative history or comment exists to aid the interpretation," *In re Twitchell,* 72 B.R. p. 434 (Bankruptcy Court opinion). The language of the statute indicates that the terms "fraud," "defalcation," "embezzlement" and "larceny" are of coequal rank and express the main subject matter of this exception to discharge. "Fraud" means "actual fraud," *In re Black,* supra, and "embezzlement" and "larceny" both require evil intent comparable to criminal *mens rea, In re Wallace,* supra, 26 Am. Jur.2d, supra. Under such circumstances, the rule of *ejusdem generis* suggests that "defalcation" should be construed to mean something comparable to "actual fraud," "embezzlement" and "larceny"—requiring some sort of "moral dereliction" and not including "innocent defaults," *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d p. 511. But the courts have done just the opposite: they have given "defalcation" a broader construction than other terms under § 523(a)(4), so that even wholly innocent defaults by fiduciaries may be excepted from discharge.

Unlike the case law under the Bankruptcy Act, the court interpreting the scope of defalcation under the Bankruptcy Code are in agreement on several points. First, defalcation is the failure to account for money or property that has been entrusted to one. See, *In re Wolfington,* 48 B.R. 920, 923 (Bkrtcy.E.D.Pa. 1985); *In re Owens* 54 B.R. 162 [ (Bkrtcy.D.S.C.1984) ]; *In re Cowley,* 35 B.R. 526 (Bkrtcy.D.Kan.1983); *In re Waters,* 20 B.R. 277 (Bkrtcy.W.D.Tex.1982). Second, defalcation is a broader term than either embezzlement or misappropriation. See *In re Wolfington,* supra; *In re Weaver,* 41 B.R. 649 (Bkrtcy. W.D.Okla.1984); *In re Cowley,* supra; *In re Waters,* supra. Third, defalcation is evaluated by an objective standard and no element of intent or bad faith need be shown. See *In re Gonzales,* 22 B.R. 58 (Bkrtcy. 9th Cir.1982); *American Ins. Co. v. Lucas,* 41 B.R. 923 (D.W.D.Pa. 1984); *Martino v. Brown,* 34 B.R. 116 (D.N.M.1983); *In re Petersen,* 51 B.R. 486 (Bkrtcy.D.Kan.1985); *In re Gagliano,* 44 B.R. 259 (Bkrtcy.N.D.Ill. E.D.1984); *In re Waters,* supra.

... For example, the court in *Cowley* wrote that defalcation "is the slightest misconduct, and it may not involve misconduct at all. Negligence or ignorance may be defalcation." 35 B.R. at 529. The *Wolfington* court concluded that "[i]t is irrelevant that the default by the fiduciary was innocent." 48 B.R. at 923. In *Waters,* the court found that a "simple failure to account for funds ... will render the ensuing debt nondischargeable...." 20 B.R. at 280.

Section 523(a)(4) excepts from discharge a debt arising from "defalcation while acting in a fiduciary capacity." Defalcation is the failure to account for funds entrusted to one; fiduciary capacity c[o]nnotes the idea of trust or confidence. *In re Romero,* 535 F.2d at 621. The failure to account for funds results in a breach of this trust or confidence. Negligence is defined as the breach of a duty recognized by the law which requires a person to conform to a certain standard of conduct. W. Prosser, LAW OF TORTS § 30, at 143 (1971). Therefore, in the opinion of the Court, negligence would be a more accurate term to

use to describe this failure to account for funds as a fiduciary. Nevertheless, this Court accepts the use of such terms as "innocent," "ignorant," or "simple" default or failure to the extent that they are intended to describe this breach of duty.

... The breaching of this fiduciary duty is a sufficiently bad act to except the ensuing debt from discharge. The requisite "badness," to conform with the spirit of the bankruptcy laws, is supplied by the special legal status of a fiduciary and the breach of the attendant duties and higher standard of dealing. *In re Johnson,* 691 F.2d at 256,

*In re Twitchell,* 72 B.R. pp. 435–436 (Bankruptcy Court opinion).

It is not clear why the rule of *ejusdem generis* has been applied to narrow the meaning of "fiduciary capacity" (even though such application has been inappropriate since at least 1867) but has not been applied to narrow the meaning of "defalcation" (even though such application has arguably been appropriate since at least 1867, and more than ever since 1978). In theory, bankruptcy law provides

... "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt[,]" [but] limits the opportunity for a completely unencumbered new beginning to the "honest but unfortunate debtor,"

*Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 658–660, 112 L.Ed.2d 755, 764–765 (1991) quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230, 1235 (1934). Statutory exceptions to discharge should be construed and applied in a manner that furthers both aspects of this basic policy: an effective fresh start, but only for deserving debtors. The present interpretation of "defalcation while acting in a fiduciary capacity," which reads "fiduciary capacity" *narrowly* but "defalcation" *broadly,* does not further this basic purpose—it manages to allow discharge of some heinous abuses of confidence which do not happen to involve "technical" trusts, while impeding the "fresh start" of some

honest but unfortunate (or merely negligent) fiduciaries. Bankruptcy purposes would actually be best served if "fiduciary capacity" were read *broadly* (in the manner of the 10th Circuit Court in *Devery Implement Co. v. J.I. Case Co.,* supra) while "defalcation" were read *narrowly* (as by Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst,* supra). This would allow most confidential relationships the benefit of protection, but would limit such protection (and the corresponding penalty to debtors) to the more heinous breaches of such confidences. This would except from discharge most "dishonest" debts, and discharge most "honest" ones.

This Court agrees with Judge Learned Hand that "the authorities are not indeed very satisfactory." The most satisfactory of the lot is Judge Learned Hand's own opinion in *Central Hanover Bank & Trust Co. v. Herbst,* which this Court will attempt to follow.

In the present instance, there is no evidence before the Court of any conduct by Turner involving "moral dereliction" comparable to actual fraud, embezzlement or larceny. But Turner has not been innocent, either. Turner was a fiduciary; an Oklahoma statute imposed on him the duty to hold funds for payment of this debt; Discount was entitled to rely on Turner's compliance with his statutory duty to hold such funds for payment of Discount's debt; Turner did not do his duty; and a State court has granted Discount a judgment against Turner for the funds owed as well as *in rem* against the real estate involved. Turner's nonpayment of this claim amounts to an act of releasing trust funds in violation of 42 O.S. § 152; such act is not mere mistake, mismanagement or ordinary negligence, but is misconduct of just the sort that the State statute forbids. That is enough to constitute "defalcation" for present purposes.

The Court concludes that Turner's debt to Discount for $6,604.47 is excepted from discharge under 11 U.S.C. § 523(a)(4), "for ... defalcation while acting in a fiduciary capacity." Judgment shall be entered ac-

cordingly. Discount shall prepare and submit an appropriate form of judgment.

AND IT IS SO ORDERED.